THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, vs. THE
ILLINOIS CENTRAL RAILROAD COMPANY, Appellant.

*Opinion filed April 20, 1916—Rehearing denied June 8, 1916.*

1. ILLINOIS CENTRAL RAILROAD—*purpose of charter provision
for payment of five per cent of gross income.* The provision of
the charter of the Illinois Central Railroad Company for the pay-
ment to the State of five per cent of the gross income of the com-
pany was intended not only as compensation to the State for the
"grants, privileges and franchises" of the company, but also, in
part, as commutation for all taxes on its charter lines other than
State taxes.

2. SAME—*extent of exemption of the Illinois Central Railroad
Company from payment of taxes.* Under the charter contract be-
tween the State of Illinois and the Illinois Central Railroad Com-
pany the company has been relieved from the payment on its char-
ter lines of all other than State taxes, and these are to be assessed
as provided in the charter.

3. SAME—*in assessing State tax the Auditor must follow rules
used by other officials.* Subject to the special provisions of the
charter of the Illinois Central Railroad Company, the Auditor of
Public Accounts, in assessing and levying the State tax against
the property of the company, must follow the same method and
be governed by the same rules as used by other public officials in
listing, assessing and levying State taxes, and the State taxes to
be levied against the property of the company, under section 22 of
its charter, are the regular State taxes levied on other property.

4. SAME—*the State tax must be assessed on the same propor-
tion of full cash value as other owners are assessed.* The State
tax against the property of the Illinois Central Railroad Company
must be assessed on the same proportion of the fair cash value
of such property as is used throughout the State in assessing the
property of other owners, which at the present time is on the basis
of one-third of the equalized value and not the full cash value of
the property.

5. SAME—*company is entitled to deduction of bona fide debts
from credits.* In conformity with the rule of equality and uniform-
ity required by the constitution in assessing and levying taxes, the
Illinois Central Railroad Company is entitled, in listing its prop-
erty for the purpose of the State tax, to the same deductions of
*bona fide* debts from credits listed by it as are authorized by the
general Revenue law in case of the property of other persons or
corporations.

6. SAME—*what accounts are not required to be kept by company.* It is the duty of the Illinois Central Railroad Company to make a return, in its schedule, of all of its charter line property at its fair cash value, and, if the Auditor of Public Accounts is not satisfied with the schedule, to furnish him every reasonable facility for ascertaining the charter line property and its value, but it is not required to keep separate accounts of its charter line and non-charter line property merely to enable the Auditor to more conveniently assess the charter line property.

7. SAME—*the Auditor cannot arbitrarily assess non-charter line property as charter line property.* The fact that the Auditor is not satisfied with the schedule of its charter line property made out by the Illinois Central Railroad Company does not justify that official in arbitrarily assessing, for the State tax, property belonging to the non-charter lines of the company.

8. SAME—*company is bound by its schedule as to value of its property.* The Illinois Central Railroad Company is bound by the statements in its schedule as to the value of its property in the absence of fraud, accident or mistake, even though the Auditor refuses to accept the schedule and is not misled thereby, as the rule which precludes a tax-payer in this State from questioning the accuracy of his own return is based upon public policy and not upon the doctrine of estoppel.

9. SAME—*company must give valuation of its property in its schedule.* Under section 22 of the charter of the Illinois Central Railroad Company and section 3 of the act of 1859, it is the duty of the company not only to return to the Auditor a list of the stock, property and assets of the charter lines, but also to give the valuation of such stock, property and assets.

10. SAME—*Auditor cannot assess all rolling stock.* In assessing the rolling stock of the Illinois Central Railroad Company for the State tax provided for in its charter, the Auditor is not entitled to assess the entire rolling stock of such company but only such portion thereof as is fairly assessable to the charter lines.

11. SAME—*tangible property having a permanent situs in other States cannot be assessed.* Tangible property, other than rolling stock, having a permanent situs in other States cannot be assessed by the Auditor in making an assessment of the property of the Illinois Central Railroad Company for the State tax provided for in its charter.

APPEAL from an assessment of the Auditor of Public Accounts.

W. S. HORTON, and G. A. DUPUY, (BLEWETT LEE, and JOHN G. DRENNAN, of counsel,) for appellant.

P. J. LUCEY, Attorney General, HIRAM T. GILBERT, and C. LEROY BROWN, for the People.

Mr. JUSTICE CARTER delivered the opinion of the court:

The Illinois Central Railroad Company on October 5, 1913, filed a schedule of its stock, property and assets with the Auditor of Public Accounts, giving as the value of its property to be assessed for State taxes for that year the sum of $189,185,593.49. On January 5, 1914, the company received a notice of the disapproval of the values given in said schedule and a statement of re-valuation and assessment prepared by and under the direction of said Auditor, fixing the valuation at $365,559,617.23. In the meantime the rate necessary to be levied to obtain the amount of tax required for State purposes had been fixed by the proper officers at seventy cents on the $100 valuation. The State Auditor, in levying the State taxes against said company, levied on the full amount last mentioned at the rate of seventy cents. From that assessment this appeal was taken by the company to this court. At its February term, 1914, this court appointed, with the approval of both parties, Hon. Leslie D. Puterbaugh as commissioner to take evidence and report the same, together with his conclusions as to the law and facts. Said commissioner proceeded to take evidence, and after full hearing of counsel for both parties made his report to this court at the February term, 1915, fixing the value of the property of said company at $117,466,638.94, which he found should be equalized at seventy per cent of such total value, or at the sum of $82,226,647.25, and that the State tax should be levied only on one-third of this equalized value, or $27,-408,883.41, and that this last named amount should be assessed at seventy cents on each $100. To this report the

State filed 133 exceptions in this court. The questions raised by these exceptions were thereafter fully argued in this court by counsel, both for the State and the company. We shall consider herein all questions that we deem essential to a decision of the points involved.

The General Assembly passed an act on February 10, 1851, incorporating the Illinois Central Railroad Company. March 19 of the same year the company, having been duly organized by the election of a board of directors, accepted this act of incorporation. This act is the charter of said company. It invested the company with "all the powers, privileges, immunities and franchises, and of acquiring by purchase or otherwise, and of holding and conveying, real and personal estate which may be needful to carry into effect fully the purposes and objects of this act;" authorized it to survey, locate, construct, complete, alter, maintain and operate a railroad, with one or more tracks or lines of rails, from the southern terminus of the Illinois and Michigan canal to a point at the city of Cairo, with a branch to the city of Chicago, on Lake Michigan, and also a branch, *via* the city of Galena, to a point on the Mississippi river opposite the town of Dubuque, in the State of Iowa; gave it a right of way, not exceeding two hundred feet in width, for its entire length, with the authority to use any lands, streams and materials of every kind for locating depots, constructing bridges, dams, embankments, station grounds, spoil banks, turn-outs, engine houses, shops and other buildings; fixed its capital stock at $1,000,000 and authorized a further increase from time to time, under certain conditions; granted certain lands in the State to said company for the purpose of assisting in locating, constructing, maintaining and operating said road, granting to it, in addition to its right of way and other property, 2,595,000 acres of land. The sections of the act necessary to be particularly considered in passing on this question are 18 and 22 of said charter grant, and read as follows:

"Sec. 18. In consideration of the grants, privileges and franchises herein conferred upon the said company for the purposes aforesaid, the said company shall, on the first Mondays of December and June, in each year, pay into the treasury of the State of Illinois five percentum on the gross or total proceeds, receipts, or income derived from said road and branches, for the six months then next preceding. The first payment of such percentage on the main trunk of said road to commence four years from the date of said deed of trust, and on the branches, six years from the date aforesaid, unless said road and branches are sooner completed, then from the date of completion. And for the purpose of ascertaining the proceeds, receipts or income aforesaid, an accurate account shall be kept by said company, a copy whereof shall be furnished to the Governor of the State of Illinois, the truth of which account shall be verified by the affidavits of the treasurer and secretary of such company. And for the purpose of verifying and ascertaining the accuracy of such account, full power is hereby vested in the Governor of the State of Illinois, or any other person by law appointed, to examine the books and papers of said corporation, and to examine, under oath, the officers, agents and employees of said company, and other persons. And if any person, so examined by the Governor or other authority, shall, knowingly and willfully, swear falsely, or if the officers making such affidavits shall, knowingly and willfully, swear falsely, every such person shall be subject to the pains and penalties of perjury."

"Sec. 22. The lands selected under said act of Congress, and hereby authorized to be conveyed, shall be exempt from all taxation under the laws of this State, until sold and conveyed by said corporation or trustees, and the other stock, property and effects of said company shall be in like manner exempt from taxation for the term of six years from the passage of this act. After the expiration

of six years, the stock, property and assets belonging to said company shall be listed by the president, secretary or other officer, with the Auditor of State, and an annual tax for State purposes shall be assessed by the Auditor upon all the property and assets of every name, kind and description belonging to said corporation. Whenever the taxes levied for State purposes shall exceed three-fourths of one percentum per annum, such excess shall be deducted from the gross proceeds or income herein required to be paid by said corporation to the State, and the said corporation is hereby exempted from all taxation of every kind, except as herein provided for. The revenue arising from said taxation, and the said five per cent of gross or total proceeds, receipts or income aforesaid, shall be paid into the State treasury in money, and applied to the payment of interest-paying State indebtedness, until the extinction thereof : *Provided,* in case the five per cent provided to be paid into the State treasury and the State taxes to be paid by the corporation, do not amount to seven per cent of the gross or total proceeds, receipts or income, then the said company shall pay into the State treasury the difference, so as to make the whole amount paid equal at least to seven per cent of the gross receipts of said corporation." (Private Laws of 1851, pp. 71, 72.)

In 1859 the General Assembly passed an act which referred particularly to the method of assessing the property of said company for the State tax, as required under said section 22 of the charter. Said act of 1859 provided, among other things, that if the company should neglect or refuse to list with the Auditor, on or before the first day of April in each year, the stock, property and assets owned by said company, as required by its charter, then it should be the duty of the Auditor to list the same and place a valuation thereon and assess thereon a tax, but he should only assess said property for State purposes, giving said Auditor an opportunity to inspect the books of the com-

273 — 15

pany and examine its officers, and providing further that if the company should list its stock, property and assets as required by its charter, and if the Auditor believed the valuation placed by said company too low or that the company had not included all of its property, he should notify the railroad company of his disapproval thereof and proceed to make out a list himself, and then continued:

"Sec. 4. That in order to make out the list herein provided to be made, the Auditor may either make out the same in the aggregate, or by specifications of the particular kinds of stock, property and assets, owned by said company, as provided in section twenty-two of the charter of said company.

"Sec. 5. That in either case provided herein, when the Auditor shall make out the list and valuation, as herein provided, he shall notify said company thereof; and if said company shall be dissatisfied with such list and valuation, they shall be allowed to appeal from the decision of the Auditor to the Supreme Court, notice of which appeal shall be filed with the Auditor, who shall thereupon transmit to the clerk of said Supreme Court a certified copy of said list and valuation, and it shall be the duty of said Supreme Court, at the term next succeeding the taking of such appeal, upon such evidence as may be presented by the State and said company, to hear and determine the aggregate value of the stock, property and assets owned by said company.

"Sec. 6. That whenever an appeal is taken to the Supreme Court and the question herein provided to be heard and determined by said court is determined, it shall be the duty of the clerk to certify the aggregate value, so found, to the Auditor of Public Accounts, who shall assess a tax thereon for State purposes.

"Sec. 7. That the Auditor of Public Accounts shall draw his warrant upon the State Treasurer for all expenses incurred under and by virtue of this act: *Provided,*

that in case of an appeal to the Supreme Court, by said company, then said company shall pay all costs made by said company.

"Sec. 8. That the terms 'list' and 'valuation,' as used in this act, shall be deemed and taken to mean the stock, property, assets and other things owned by said company, set down in a list or schedule for taxation, and the value placed thereon, as above provided.

"Sec. 9. This act is intended to supply omissions in the law as heretofore existing, so as to enable the State to enforce the listing of the property of the Illinois Central Railroad Company, and the valuation and assessment thereof, and to make it the duty of the Auditor to value and assess the stock, property and assets owned by said company, for the years eighteen hundred and fifty-seven and eighteen hundred and fifty-eight: And it is further provided, that all the provisions of this act shall apply to the listing, valuations and assessments of said years, as well as to all future listings, valuations and assessments. This act shall be in force from and after the date of its passage." (Laws of 1859, p. 206.)

Under said section 22 of its charter the company paid no taxes for the first six years of its incorporation. The proof in the record shows that in 1857 it listed its property with the Auditor, placing thereon the value of $19,711,-559.59. This valuation was accepted by the Auditor and the regular State tax rate of sixty-seven cents per $100 was assessed against it for the State tax of the company. In 1858 the company listed its property at $7,650,000, and, so far as appears from the record, the Auditor assessed no tax that year upon this list and valuation. In 1859 the company listed its property with the Auditor at a total valuation of $4,952,000. The Auditor, acting in accordance with the provisions of said act of 1859, notified the company that he disapproved of such valuation and proceeded himself to make out a list, valuing the property

at $13,000,000, upon which valuation he assessed the rate of sixty-seven cents on the $100. The company, on being notified of the Auditor's disapproval of its valuation, took an appeal to the Supreme Court under the provisions of said act of 1859. The Auditor thereupon certified the valuations to this court. The court, upon that appeal, heard the evidence in open court, and upon such testimony fixed the value of the property at $4,952,000 and directed the clerk to certify to the Auditor the aggregate value so found. An opinion does not seem to have been published in our Reports as to this hearing, but in an action of debt which was brought in 1859 to recover the tax assessed for 1857 this court found the issues for the defendant in pursuance of a stipulation between the State and the company that the court might find the value of the property for 1857 from the evidence introduced on the appeal from the assessment for 1859. (*State* v. *Illinois Central Railroad Co.* 27 Ill. 64.) The Auditor does not seem to have required, nor the company to have filed, a schedule of its property from the year 1859 until the year 1906, when, upon the Auditor's request and upon blanks furnished by him, the company listed its property, and against the "assessed value" fixed by the Auditor the current State tax rate was extended, the Auditor first having requested and obtained from the then Attorney General, William H. Stead, an opinion that the State tax rate should be extended, not against the full value of said property but against the assessed value, and that in assessing the stock, property and assets of said company, credits and deductions should be permitted on the same basis as was allowed other property owners under the general Revenue law. Similar lists were filed in the years from 1907 to 1912, inclusive, and the property was taxed at the equalized assessed value, allowing deductions as to credits in accordance with said opinion of the Attorney General. The company filed its schedule for the year 1913, and the Auditor disapproved and filed

his list with a valuation, as heretofore stated. The evidence shows that the Auditor was advised by the present Attorney General to disapprove the valuation given in the schedule of the company, and that he also followed the advice of the Attorney General as to the course he should take in placing valuations upon the company's property. The Auditor, when on the witness stand, admitted frankly that he himself had little knowledge of the value of the property and had trusted to the information given him by others as to the method of fixing the values and making the assessment. In a written opinion to the Auditor with reference to the method of assessing, the Attorney General said, among other things: "In 1906 the Attorney General advised the Auditor to allow the company the deductions provided for by the general Revenue law. It is unnecessary to discuss the question whether the view taken by the Attorney General was the correct one. The question is at least debatable, and under these circumstances the proper course for the Auditor is to follow strictly the provisions of the company's charter and the act of 1859, leaving it to the company, if dissatisfied, to appeal to the Supreme Court, where the question may be authoritatively settled." The Auditor assessed the property at its full cash value and not at one-third its value, as other property was assessed under the general Revenue law, and also refused to consider any deductions of debts from credits.

Under said sections 18 and 22 of its charter the company is required to pay the State, each year, five per cent on the gross or total proceeds or income derived from its road and branches and in addition to pay "an annual tax for State purposes," to "be assessed by the Auditor upon all the property and assets of every name, kind and description belonging to said corporation," but when "the taxes levied for State purposes shall exceed three-fourths of one percentum per annum, such excess shall be deducted from the gross proceeds or income herein required to be paid by

said corporation to the State," and in any event it is provided that if the five per cent of the gross or total proceeds to be paid by the corporation, plus the annual State tax, "do not amount to seven per cent of the gross or total proceeds, receipts or income, then the said company shall pay into the State treasury the difference, so as to make the whole amount paid equal at least to seven per cent of the gross receipts of said corporation." Manifestly, the parties to this charter contract were of the opinion that the State taxes to be levied for any given year might be higher than three-fourths of one per cent per annum, and that the total amount raised by said levy for State taxes might amount in any given year to more than two per cent of the gross receipts of said corporation. The record shows that in the years 1857, 1858 and 1859, when the property was listed with and taxed by the Auditor, the tax assessed by said Auditor did not amount to more than two per cent of the gross receipts reported by the company to the Governor, and that therefore the amounts paid during all these years, when the property was so listed with and taxed by the Auditor for State taxes, was seven per cent of the gross receipts of the company. While there is no definite proof in the record as to the reason why the property of the company was not listed with and taxed by the Auditor for State taxes from the years 1860 to 1905, inclusive, it seems quite obvious that the failure to do this was due to the fact that the public authorities were of the opinion that two per cent of the gross proceeds would more than cover any amount of State taxes that could be levied, under the charter, on the property of the company. By the method of assessment adopted by the Auditor, under the advice of the Attorney General, for the year 1913 here under consideration, the assessment levied by the Auditor against the company for State taxes amounted to $2,558,917.32. Seven per cent of the gross receipts of the company for the year ending October 31, 1913, as reported by the com-

pany and paid into the State treasury, amounted to $1,355,-
178.98. The item of State tax as thus assessed by the
Auditor for the year here in question exceeded the entire
two per cent of the gross receipts by $2,171,723.34, being,
as can readily be seen by comparison, more than a million
dollars in excess of the entire seven per cent of the gross
receipts paid into the State treasury for that year.

Counsel for the State have cited other statutes which
they argue bear on the proper construction to be given to
the statutes already referred to. We do not consider it
necessary to set out these statutes at length, as we do not
deem that they materially change the construction that
should be put upon the sections of the charter necessary
to be construed.

### *State Tax.*

One of the principal questions in dispute between coun-
sel in this case is as to what was meant in said section 22
of the charter of the company by "an annual tax for State
purposes." Counsel for the company insist that by its char-
ter it agreed to pay only the same State tax that other
property owners were compelled by general law, from time
to time, to pay, while counsel for the State insist that the
company agreed to pay an annual tax for State purposes
levied by the Auditor under the State charter, without any
regard to the State taxes paid by other property owners.
In support of their contention on this point, counsel for the
State argue that the five per cent of the company's gross
receipts provided for in section 18 was compensation solely
for grants, privileges and franchises secured to the com-
pany by said charter; that it had nothing to do with the
company's taxes and did not enter into and was not a part
of the payment substituted for the payment of other taxes.

Counsel argue that the words "grants, privileges and
franchises" were not intended to include taxes of any kind.
With this we cannot agree. Whatever doubt might have
originally existed as to the proper construction of sections

18 and 22 of the charter on this question has been settled
by the decisions of this court in construing the charter of
appellant.   In *Illinois Central Railroad Co. v. County of
McLean*, 17 Ill. 291, the court said (p. 294): "Such we
view the rule adopted with the plaintiff, by taking five per
cent of the gross income in lieu of all taxes for a period
of six years, as well as for the grants, privileges and fran-
chises conferred, and after that period expires to put them
upon the footing of an assessment equal to two per cent
addition to the five per cent." In *Neustadt* v. *Illinois Cen-
tral Railroad Co.* 31 Ill. 484, the court said (p. 485): "In
consideration of the undertaking of the company to con-
struct a great thoroughfare, which should involve the ex-
penditure of millions and which was an experiment, and
seven per cent of the gross amount of its receipts or in-
come to be paid to the State, the company was relieved
from the payment of all other than State taxes, to be as-
sessed as provided for in this section.   The language is
plain and explicit,—'the said corporation is hereby ex-
empted from all taxation of every kind except as herein
provided for.' "   To the same effect as this last case is *Illi-
nois Central Railroad Co.* v. *Irvin*, 72 Ill. 452.   In *People
v. Illinois Central Railroad Co.* 215 Ill. 177, this court said
(p. 178): "In consideration of the construction of appel-
lee's road and the payment by it of seven per cent of the
gross amount of its receipts or income to the State, appel-
lee has been relieved from payment of all other than State
taxes, to be assessed as provided for in section 22 of its
charter."   In *State* v. *Illinois Central Railroad Co.* 246 Ill.
188, the opinion said (p. 207): "Beyond question, all of
the revenue provided under this charter is based on a con-
tract and in lieu of and intended as a fair equivalent for
ordinary taxes."   And again, on page 220: "Clearly, the
provisions of appellee's charter as to revenue were inserted
as a fair method of fixing an equivalent for a tax that

would otherwise ordinarily be levied on the property of appellee," etc.

The reasoning of this court in *State* v. *Illinois Central Railroad Co.* 27 Ill. 64, *Hunsaker* v. *Wright,* 30 id. 146, *People* v. *Barger,* 62 id. 452, *Illinois Central Railroad Co.* v. *Goodwin,* 94 id. 262, *Donahue* v. *Illinois Central Railroad Co.* 165 id. 640, and *State Board of Equalization* v. *People,* 229 id. 430, tends to support the conclusion reached in the other cases just quoted from, that the five per cent of the gross income of the company was paid, not only for the franchises of the road, as that word is ordinarily understood, but in part commutation for all other than State taxes. It is true, as stated in decisions cited by counsel for the State, such as *Rochester Railway Co.* v. *Rochester,* 205 U. S. 236, and *Great Northern Railway Co.* v. *State,* 216 id. 206, that an immunity or exemption from taxation has been frequently held not to be a grant, privilege or franchise. But in those cases, as in all others called to our attention, the decision turned upon the meaning of the language of the statute or contract right being construed. The word "privilege" has been used to include the privilege of exemption from taxation. (*Tennessee* v. *Whitworth,* 22 Fed. Rep. 75; *Tomlinson* v. *Branch,* 82 U. S. 460; 6 Words and Phrases, 5585; 3 id.—2d series,— 1207.) An "exemption is an immunity or privilege." (*State* v. *Smith,* 158 Ind. 543.) "Words in a constitution, as well as words in a statute, are always to be given the meaning they have in common use, unless there are very strong reasons to the contrary. We find no such reasons in this case, and, as an exemption from taxation is a privilege in the popular sense of that term, we feel ourselves compelled to decide that both the Tennessee and Alabama company and the Central Southern company were granted such an exemption." (*Tennessee* v. *Whitworth,* 117 U. S. 139.) Each case necessarily depends upon the wording of the contract or statute. It is quite common to describe the

giving of an immunity from taxation as a "grant of the State." *Dutton* v. *Board of Review,* 188 Ill. 386; 37 Cyc. 884, and cited cases; *Humphrey* v. *Pegues,* 16 Wall. 244.

When this charter was granted, the privilege or franchise to build this railroad was not considered of any special value. In the fifteen years, more or less, previous to the granting of this charter the public authorities had made several attempts to build a railroad similar to the one that was finally constructed by appellant company, and in one act the State had appropriated three and a half million dollars for that purpose. The Congress of the United States also in 1850 passed an act granting to the State of Illinois a right of way through the public lands and the ownership of every alternate section of land for more than six miles in width on each side thereof, to aid the State in constructing the railroad finally built by appellant. The history of a part of the legislation on this subject is found in *State* v. *Illinois Central Railroad Co.* 246 Ill. 188, on pages 196-198. In section 6 of article 10 of the constitution of 1848 it was provided that "the General Assembly shall encourage internal improvements, by passing liberal general laws of incorporation for that purpose." In passing the Land Grant act, granting to the State the alternate sections of land afterward received by appellant company from the State, Senator Stephen A. Douglas in the United States senate said: "It is simply carrying out a principle which has been acted upon for thirty years, by which you cede each alternate section of land and double the price of the alternate sections not ceded, so that the same price is received for the whole. These lands have been in the market from fifteen to thirty years. The average time is about twenty-three years. But they will not sell at the usual price of $1.25 per acre because they are distant from any navigable stream or a market for produce. A railroad will make the lands salable at double the usual price, because the improvement made by the State will make

them valuable." (21 Congressional Globe, April 29, 1850, part 1, p. 845.) The year this charter was granted, Gov. French, then chief executive of the State, said: "The constitution having wisely debarred the State from again involving its credit in wild and visionary schemes of internal improvement, their chance of success rests upon individual skill, capital and enterprise." (Senate Journal, 1849-51, p. 20.) The value of the grant to the appellant company of 2,595,000 acres of land is to be determined, not by what such land is worth now, but what it was worth at the time the charter was granted. It is a well known fact, as stated by Senator Douglas, that at that time land would not sell readily for $1.25 an acre. The land then granted to the company is now of great value, but in 1851, at the time the charter was granted, it was undeveloped and its ultimate value entirely problematical.

So far as the records and proof in this proceeding show, and so far as we are advised, this is the first time that anyone has ever questioned the fact that the five per cent of the gross receipts in said section 22 was intended, in part, as a substitute payment for all other than State taxes. Not only have the public authorities and the officials of the company so construed these provisions of the charter, but, in the light of the history of the enactment of this charter, we think no other conclusion can be reached, if its provisions be fairly construed, than that heretofore reached by decisions of this court. We re-affirm what has already been said more than once by this court, that in consideration of the construction of appellant's road and the payment by it of seven per cent of its gross income to the State it has been relieved from the payment of all other than State taxes, to be assessed as provided in its charter. *Neustadt* v. *Illinois Central Railroad Co.* 31 Ill. 484; *Illinois Central Railroad Co.* v. *Irvin*, 72 id. 452.

Is the State right in its contention that the State tax, so called, is in reality not a tax in the sense in which

that term is used in the general Revenue law but only an agreed payment in lieu of the State tax, not to be determined or controlled by the general Revenue law of the State but only by the judgment of the State Auditor, limited by the provision in the charter that such State taxes shall not exceed three-fourths of one per cent, or seventy-five cents on the $100? The State tax provided for in section 22 is based upon a contract, (*Illinois Central Railroad Co.* v. *County of McLean,* 17 Ill. 291; *People* v. *Barger,* 62 id. 452; *State* v. *Illinois Central Railroad Co.* 246 id. 188;) and it is therefore not an ordinary tax, as that word is frequently used, but, being based on this charter contract, the State tax here in question must be governed by the provisions of that contract. Therefore such State tax can never be more than three-fourths of one per cent on the property of appellant. It is to be assessed and levied by a different officer from the public official who assesses and levies the ordinary State taxes, under the general Revenue law, on the property of other owners, and said State tax here in question, when collected, may be used for different purposes than ordinary State taxes should be used. Counsel for the company insist that with these exceptions the State tax assessed, levied and collected against its property must be governed by the general Revenue law of the State. Counsel for the State, on the other hand, contend that if such had been the intention, the statute under which the company was incorporated would have so stated in specific words.

The usual rule is, as stated by Cooley, that in the "exercise of the power to tax, the purpose always is that a common burden shall be sustained by common contributions, regulated by some fixed general rule and apportioned by the law according to some uniform ratio of equality. So the power is not arbitrary but rests upon fixed principles of justice, which have for their object the protection of the tax-payer against exceptional and invidious exac-

tions, and it is to have effect through established rules operating impartially." (1 Cooley on Taxation,—3d ed.—4.) Again, the same author states: "Apportionment of the burden is a necessary element in all taxation." (Ibid. 411.) In the absence of a constitutional restriction on the State legislature there is no requirement that all taxes be uniform or on an equal basis. (*Eurigh* v. *People,* 79 Ill. 214; *DuPage County* v. *Jenks,* 65 id. 275.) The Federal courts have held that the requirement of uniformity which the constitution imposes upon Congress in the levy of excise taxes is not an intrinsic uniformity but merely a geographical one. (*Billings* v. *United States,* 232 U. S. 261.) Section 2 of article 9 of the Illinois constitution of 1848 provided: "The General Assembly shall provide for levying a tax by valuation, so that every person and corporation shall pay a tax in proportion to the value of his or her property." A similar provision is found both in the constitution of 1818 and that of 1870. By section 2 of article 9 of the constitution of 1848 it is further provided that "the General Assembly shall have power to tax peddlers, auctioneers, * * * toll bridges and ferries, and persons using and exercising franchises and privileges, in such manner as they shall, from time to time, direct." A provision similar to this is found in the constitution of 1870, except that there was no requirement in the constitution of 1848, as in the present one, that this method of taxation should be by general law and that the taxation should be uniform as to the class upon which it operates. (*Sterling Gas Co.* v. *Higby,* 134 Ill. 557.) It is because of this last named provision of said section 2 of article 9 of the constitution of 1848 that this court upheld the provisions of this charter authorizing the substituted method of taxation in the nature of a commutation of taxes, in lieu of ordinary taxes. (*Illinois Central Railroad Co.* v. *County of McLean,* 17 Ill. 291; *Hunsaker* v. *Wright,* 30 id. 146; *People* v. *Barger,* 62 id. 452; *State Board of*

*Equalization* v. *People,* 229 id. 430; *State* v. *Illinois Central Railroad Co.* 246 id. 188.) It may be conceded for the purposes of this case that the legislature, in granting this charter, not only could have departed from the rules of uniformity, equality and apportionment of value as to the requirements in the payment of the five per cent and the two per cent on the gross income of the company, but could also have departed therefrom in levying a so-called State tax had they so desired. That, however, in our judgment, is not the question here to be decided. The question is, did the legislature by the provisions of section 22, read in connection with the rest of the charter, intend to depart from such rules in levying on the property of appellant the State tax provided for in said section 22?

The rule is elementary that the authority to impose upon property an unusual tax, or revenue liability upon an exceptional basis of value, must be given, under the law, in clear and unmistakable terms. (*Fidelity Co.* v. *Board of Review,* 264 Ill. 11; *People* v. *Griffith,* 245 id. 532; *Town of Drummer* v. *Cox,* 165 id. 648.) We find nothing in the wording of the charter that supports the argument of counsel for the State on this point. Said section 22 on this point reads, that "an annual tax for State purposes shall be assessed by the Auditor," etc. The language, in our judgment, is clear and unambiguous, and means that the property and assets of the company shall bear the burden of ordinary State taxes. The same idea is carried out in the remainder of the section wherever these taxes are referred to, as in the expression "whenever the taxes levied for State purposes shall exceed three-fourths of one percentum," and in the term "revenue arising from said taxation." The proviso also refers to "State taxes." Said act of 1859, with reference to the methods of levying this State tax, is still in force, and the words "list," "valuation," "assess," "taxation" and "tax for State purposes," are used both in said charter and in said act of 1859. These words

all had a common meaning in the Revenue law of that period. It is a rule of construction that the words of a statute must be taken in their plain, obvious and ordinary signification as used in like statutes. (2 Sutherland on Stat. Const.—2d ed.—864.) The phrase "assessed by the Auditor," in said section 22 of the charter, was common in the revenue statutes of that day. It was understood that it must be based upon valuation. In *Town of Lebanon* v. *Ohio and Mississippi Railway Co.* 77 Ill. 539, the court said: "It is indispensable there must be a valuation to support every levy or assessment of taxes." No provision is made, either in the charter of said company or in said act of 1859, as to what method shall be pursued by the Auditor in assessing and levying taxes. The natural and reasonable conclusion would be that the Auditor was to follow the same method and be governed by the same rules as used by other public officials in listing, assessing and levying State taxes. We find nothing in the wording of the charter or said act of 1859 that in any manner suggests anything to the contrary.

Counsel for the State argue that if the legislature had intended by section 22 to provide for the ordinary State tax, levied in the same manner as regular State taxes are levied under the Revenue law, they could easily have inserted a provision in the proper place in said section to the effect that the Auditor should fix the assessable value for this tax in the same manner as may be provided by law for fixing the assessable value of other property throughout the State, and that he should levy thereon in each year, in the manner provided by law, from time to time, the tax for State purposes at the same rate at which this tax is levied upon other property throughout the State. Undoubtedly, such a wording could have been inserted, but the fact that it was not does not support the argument of the State on this question. If this argument of the State be a sound one, then it might well be asked, by the same line of rea-

soning, why the legislature did not, in referring to the State taxes, simply provide that such tax should not be levied in excess of three-fourths of one per cent per annum, instead of providing, as they did, "whenever the taxes levied for State purposes shall exceed three-fourths of one percentum per annum, such excess shall be deducted from the gross proceeds or income herein required to be paid." If the Auditor, alone, could settle the rate of State taxes, without any reference to the State taxes levied on other property, why insert a useless provision that might result in levying more than three-fourths of one per cent on the dollar and then require the deduction of the excess over and above three-fourths of one per cent? Manifestly, this provision of the charter as to levying more than three-fourths of one per cent and deducting the excess can only be given a reasonable construction if it is understood to mean that the rate of State tax is fixed by some other authority than the Auditor, and that official then is required to take that rate in levying a State tax on the property of appellant company.

Counsel for the State further insist that the charter made a perpetual liability on the part of the company to pay a State property tax, and it must have been known to the State legislature, at the time the charter was granted, that all other property might be relieved, under the provisions of the constitution, from paying State taxes, and that therefore the legislature must have intended that the Auditor was not to be governed in any way by the general Revenue law in assessing and levying this tax. It is true, as stated by counsel, that a general property tax, such as a tax on personal property of the kind existing in this State and other States at the present time, is being done away with in other countries, yet up to the time this charter was granted a personal property tax was not only general in this country but in other countries of the world. It is true, some writers assert that there is reason for abolishing the

personal property tax, similar to our State tax on that
kind of property, in all jurisdictions, and while under the
constitution of 1848 authority was given to exempt from
State tax by a substituted form of taxation, the members
of the constitutional convention of 1870 doubtless had little
thought of its being practicable ever to abolish State taxes,
for they provided in section 6 of article 9 of our present
constitution, that "the General Assembly shall have no
power to release or discharge any county, city, township,
town or district whatever, or the inhabitants thereof, or the
property therein, from their or its proportionate share of
taxes to be levied for State purposes, nor shall commutation
for such taxes be authorized in any form whatsoever." If
State taxes are ever done away with in this State, by a con-
stitutional change or otherwise, it will then be time enough
to consider whether the doing away with State taxes on
other property will render nugatory the provision of sec-
tion 22 of the charter of appellant company as to the pay-
ment of State taxes. The question is not before us in this
case and need not be here considered or decided.

The further argument of counsel for the State that this
State tax was to be assessed, levied and collected by other
officers than those who assessed, levied and collected other
State taxes, does not, in our judgment, tend to support
their argument as to the nature of the State taxes pro-
vided for in this section. Other taxes at that time were
assessed and levied by the Auditor. (Act to provide for a
general system of railroad incorporation, laws of 1849,—
2d session,—sec. 30, p. 30; Private Laws of 1851, sec. 14,
p. 50.) This court has held that the assessing and levy-
ing of taxes by the Auditor did not affect the tax levied.
*Porter* v. *Rockford, Rock Island and St. Louis Railroad
Co.* 76 Ill. 561; *People* v. *Commissioners of Cook County,*
176 id. 576.

Under the rulings of this court, in construing the char-
ter of the company we can reach no other conclusion than

that the State taxes referred to in said section 22 were, under the restrictions provided for in said section, the regular State taxes that were to be levied on other property. In *Illinois Central Railroad Co. v. County of McLean,* 17 Ill. 291, it was said (p. 292) : "We feel authorized and required * * * to sustain the provisions of the twenty-second section of the act incorporating the plaintiffs, and that the payments provided for in the eighteenth section of their charter have been constitutionally substituted, under the second section of the constitution, in lieu of the general rule of uniformity and proportion fixed in its first clause." In *State* v. *Illinois Central Railroad Co.* 27 Ill. 64, this court said (p. 67) : "If, then, the property is more valuable in 1859 or in 1860 than as now found or in subsequent years, the taxes will be assessed accordingly, so that the injunction of the constitution 'that every person and corporation shall pay a tax in proportion to the value of his or her property' will be regarded." In *Neustadt* v. *Illinois Central Railroad Co.* 31 Ill. 484, it was said that in consideration of the payment of said seven per cent the company was relieved from the payment of all other than State taxes. The same thing was again said in *Illinois Central Railroad Co.* v. *Irvin,* 72 Ill. 452, and again in *People* v. *Illinois Central Railroad Co.* 215 id. 177. The same thing was repeated, in substance, in *State* v. *Illinois Central Railroad Co.* 246 Ill. 188. The history of the payment of the seven per cent by the company on its gross receipts or income to the State and the levying and collecting of the State tax, as heretofore given in this opinion, shows that up to the present time all officials who have been charged with duties in connection with the payment of this revenue by the company to the State, as provided in its charter, have understood the State taxes to mean ordinary State taxes.

If it be assumed that the meaning that should be placed upon the charter provisions of appellant company here un-

der consideration is doubtful, then the contemporaneous, uniform and long continued construction placed upon these charter provisions by public officials will have great weight with the court. (*Nye* v. *Foreman,* 215 Ill. 285; *Cook County* v. *Healy,* 222 id. 310.) "It was not only the immediate sense of the officers of the State, but their continued sense through a number of years, that the bank was exempt from all taxation, and when the right of taxation was asserted a license tax was not included. And we have authority for saying that a license tax was not demanded during a period of fifty-eight years, notwithstanding the many changes in the administrative officers of the State." (*Citizens' Bank* v. *Parker,* 192 U. S. 73.) For more than sixty years all departments of the State government have construed this provision of the charter to mean the ordinary annual State tax similar to that levied on the property of all other persons. This practice should not be lightly set aside. It should only be done if the language of the charter is so clear and unambiguous that such action would be required. As we have already seen, this is not the fact. In our judgment the language of the statute, fairly construed, can bear no other construction than that placed on it by all public officials, including this court, that the annual tax levied against the property of appellant company is the ordinary annual tax and is subject only to the limitations specifically set out in said charter.

### Equalized Value.

The record shows by the testimony of the members of the State Board of Equalization, and also by that of other public officers called from sixty-five representative counties of the State, including county treasurers, county clerks, members of boards of assessors, and others having practical knowledge of the methods of assessment in the counties, that during the year 1913, and for years prior thereto, the uniform practice throughout said counties was to adopt

as the full value of taxable property, not the full cash value but an amount not in excess of 70 per cent of the full cash value of such taxable property, with the exception that in most of the counties moneys and mortgages listed by owners were assessed at full value. The testimony shows, also, that from 1903 until 1913 the State Board of Equalization had taken this same standard,—that is, not to exceed 70 per cent of the full cash value,—as the standard to be followed by that body in assessing that class of property required by law to be originally assessed by that board. In some of the years from 1903 to 1913 the record shows that the State Board of Equalization passed a resolution to that effect. The proof shows that the property of all other railroad companies in this State for the year 1913 and prior thereto was assessed by the State Board of Equalization in accordance with this standard,—that is, fixing the "full value" of the property of all other railroads on a basis not to exceed 70 per cent of the actual cash value. The Auditor, in levying the assessment here in question, levied it upon what he had fixed as the full cash value of the property, while the commissioner appointed by this court recommends that the tax should be levied on only one-third of the total equalized value and that such assessment should be governed by the requirements of the statute as to levying all other State taxes. (Hurd's Stat. 1913, p. 2081.)

It is insisted by counsel for the State that the assessment should be levied on the basis of the full cash value and not on the one-third value, and that the charter provision found in section 22 provides that the tax shall be "upon all the property and assets of every name, kind and description belonging to said corporation;" that said act of 1859 requires the Auditor to assess the stock, property and assets upon the full value, and that when an appeal is taken to the Supreme Court the question to be heard and determined is "the aggregate value of the stock, property

and assets owned by said company," and the tax is to be
levied upon such "aggregate value" so found.  Until 1898
the statute of this State always required the State tax to
be levied upon the full cash or actual value of property,
but it is a matter of common knowledge that before that
act was passed property was not usually assessed at its full
value.  This court has always taken notice of that practice
as being long in vogue, unchallenged and recognized by the
public authorities.  (*Bureau County* v. *Chicago, Burling-
ton and Quincy Railroad Co*: 44 Ill. 229; *City of Chicago*
v. *Fishburn*, 189 id. 367.)  In this last case it was stated
(p. 376): "The assessor had always adopted some pro-
portionate basis of value, and while it was necessary for
him to determine the full value in order to take a certain
proportion or share as the assessed value, he set down the
assessed value, only."  This practice was recognized by the
Revenue law of the State in 1898, which provided that the
assessed value should be one-fifth of its actual cash value,
(Hurd's Stat. 1898, p. 1365*e*,) and by the subsequent act
of 1909, which provided that the assessed value shall be
one-third of the full value.  (Hurd's Stat. 1909, p. 1882.)

Counsel for the State insist that, regardless of these
statutes and regardless of the former practice that existed
previous to the passage of these acts, the property of ap-
pellant should be assessed at its full cash value for these
State taxes.  With this we cannot agree.  What we have
already said with reference to these State taxes being the
ordinary taxes levied on other property practically answers
all the arguments urged by the State, but the question is so
important that we deem it advisable to consider it further.

The words "the aggregate," in the statute of 1859, in
no way changed the duty of the Auditor in fixing the valu-
ation or the duty of this court on appeal.  In our judgment
the fair meaning of these words is, that instead of finding
the value of each separate item of the property the court
shall find its total or aggregate value.  They do not refer

specifically to the finding of the equalized value or as to
the duty of the court to decide whether the one-third of
the full valuation should be the value upon which the as-
sessment must be levied.   Manifestly, however, in view of
the issues raised in this case, it is the duty of the court to
find whether the Auditor should extend the assessment for
the State tax upon the full cash value or only upon one-
third of the equalized value.   This being an ordinary State
tax, as already stated, the provision of the constitution of
1848, and of the present constitution, that the tax should
be levied by valuation, "so that every person and corpora-
tion shall pay a tax in proportion to his, her or its prop-
erty," must control in levying this tax.   This court, in dis-
cussing a similar question in *Law* v. *People,* 87 Ill. 385,
said (p. 405) :  "As we have seen, all other property in
the State had been assessed at one-half its cash value.   Un-
der the law the State board had no power to increase the
aggregate valuation beyond one per cent on such aggregate
assessed valuation.   It became a question, what was to be
done?   Whatever may be the statutory injunction as to
making valuations of property for taxation, the controll-
ing authority as contained in the constitution is, it shall
be so valued that every person and corporation shall pay a
tax in proportion to his or its property.  *  *  *  A strict
observance of the statute  *  *  *  would have worked
manifest injustice as well as a plain violation of that con-
stitutional requirement that the burden of taxation should
be made to bear equally upon all property, whether owned
by private persons or by corporations.   That which the con-
stitution imposed was the higher duty, and the State board
was not at liberty to disregard its provisions."   In *Jack*
v. *Weiennett,* 115 Ill. 105, it was said (p. 109) :  "In an
exercise of the power to tax, the purpose always is that
a common burden shall be sustained by common contribu-
tions regulated by some fixed general rule and apportioned
by the law according to some uniform ratio of equality."

In *City of Chicago* v. *Larned,* 34 Ill. 203, it was said (p. 275) : "The framers of our constitution have taken unexampled pains by these separate sections to affirm the principles of 'equality' and 'uniformity' as indispensable to all legal taxation, whether general or local." In *Primm* v. *City of Belleville,* 59 Ill. 142, the opinion said (p. 143) : "Equality and uniformity of taxation have been repeatedly recognized and enforced by this court. They must be applied, not only to the rate of taxation and to the district to be taxed, but also to all the property subject to taxation." In *Ex parte Ft. Smith and VanBuren Bridge Co.* 36 S. W. Rep. 1060, the Supreme Court of Arkansas said (p. 1062) : "How, then, was the county court to afford relief to appellant? The only relief it could have afforded was to reduce the valuation so as to make it conform to the standard adopted in the valuation of other real property in the county or the average valuation of such property. Why should not this relief be granted? * * * By granting it a constitutional right will be enforced and by denying it will be withheld." In *Cummings* v. *National Bank,* 101 U. S. 153, the court said (p. 158) : "In construing this provision of the constitution the Supreme Court of Ohio has said that 'taxing by uniform rule requires uniformity not only in the rate of taxation but also uniformity in the mode of the assessment upon the taxable valuation. Uniformity in taxing implies equality in the burden of taxation, and this equality of burden cannot exist without uniformity in the mode of the assessment as well as in the rate of taxation. * * * It must be extended to all property subject to taxation, so that all property must be taxed alike, equally, which is taxing by a uniform rule.' " In *Chicago and Alton Railroad Co.* v. *Livingston County,* 68 Ill. 458, this court said (p. 460) : "So the evidence shows the valuation returned by the company to have been a fair and correct one on the basis of one-third of the actual value, yet the board doubled this valuation, so

that the property of this company was assessed at two-
thirds of the actual value while that of natural persons
in the county was assessed at only one-third of its actual
value. This cannot be done under our constitution. Tax-
ation must be uniform. There can be no discrimination
against persons. They must be taxed alike." In *Bureau
County* v. *Chicago, Burlington and Quincy Railroad Co.* 44
Ill. 229, the evidence disclosed that the property of the
company had been valued at a much higher ratio than
had been used in valuing other property. The court said
(p. 238): "The question is before us in all its length
and breadth, can a railroad company, by any action of the
corporate authorities of a county, be required to pay more
than its fair share of taxes as compared with those paid
by individuals? Does the power exist anywhere to destroy
the cardinal principle of uniformity of taxation so forcibly
and prominently insisted upon by the constitution? * * *
Regarding uniformity as the vital principle,—the dominant
idea of the constitution,—where can the power reside to
produce its opposite? Where is the power lodged, in view
of this principle, to compel A to pay, on his land or per-
sonal property of no more value than the same kind of
property belonging to B, forty per cent more taxes than
are assessed against B? We affirm such a power nowhere
exists, and if it did it would be so revolting, in its exer-
cise, to the lowest sense of justice with which our species
is imbued as to justify any and every lawful expedient for
relief against it. * * * It is an admitted fact on both
sides to this controversy that the property of no one owner
in the county of Bureau has been taxed on its real value,
and that the per cent added by the board of supervisors
to the valuation of the property of appellees imposes on
them a greater proportionate burden than the law requires
them to bear. We are of this opinion, and therefore con-
sider the action of the board unfounded in justice and in
direct opposition to the constitution. The great and at-

tractive feature of uniformity has been disregarded by the board and appellees victimized." In *Chicago and Northwestern Railway Co.* v. *Boone County,* 44 Ill. 240, where the same question was considered, the court said (p. 242) that the county board was not authorized "to withdraw the property of appellants from the protection of this constitutional principle of uniformity, and, by the addition of twenty per cent on their rolling stock and of fifty per cent on their fixed and stationary personal property, compel them to pay, thereby, more taxes on the valuation of their property than the individual citizen paid on his." This court, in discussing the statute of 1898 fixing one-fifth of the actual value as the basis for the assessment, said in *City of Chicago* v. *Fishburn,* 189 Ill. 367, on page 375: "The meaning of the term 'assessment' in connection with taxation is well understood. It is an official valuation of property for the purpose of fixing the proportion of taxes which each one shall pay. Judge Cooley, in his work on the Law of Taxation, defines it as follows: 'An assessment, strictly speaking, is an official estimate of the sums which are to constitute the basis of an apportionment of a tax between the individual subjects of taxation within the district. As the word is more commonly employed, an assessment consists in the two processes of listing the persons, property, etc., to be taxed and of estimating the sums which are to be the guide in an apportionment of the tax between them.' "

To assess implies more than to fix the full valuation at a given rate. It means to impose a tax according to some method or upon a basis of assessed valuation which may be provided by law and which does not violate the mandate of the constitution that every person and corporation shall pay a tax in proportion to the value of his or its property. It includes all the steps which the law requires to subject the property to the tax. The State tax levied under the provisions of section 22 of appellant com-

pany's charter being practically an ordinary State tax, to
levy it on a basis of full value when the State taxes on
all other property were levied at a much less value would
be violative of every principle of uniformity and equality
of taxation as laid down in the constitution. This should
not be done, even though the standard or basis fixed by
the public authorities for the assessed valuation is less than
that fixed by the statute. The requirements of the con-
stitution that there shall be uniformity and equality in tax-
ation must control over any statute or practice of assessing
officers, so that the properties of persons and corporations
shall pay a tax in proportion to their respective values.

The separate section to the constitution of 1870 which
provides that no contract obligation or liability whatever
of the Illinois Central Railroad Company shall ever be re-
leased, suspended, modified, altered or omitted, does not
in any way change the obligations of the charter of the
company. If that section had not been adopted, the lia-
bility of the company to pay the State tax under existing
legislation would be just as it is at the present time. The
charter prescribes the tax to be assessed upon a valuation,
which under our construction of the charter obligations and
the laws bearing on the subject means that this tax is to
be assessed in just proportion under the provisions of the
constitution. Before the constitution of 1870, the State,
in levying this tax, was bound to do so with due recogni-
tion of the rule that every person and corporation should
pay a tax in proportion to his or its property, and since
the tax must have been so levied before 1870 so must it
now be, because of this particular section to which refer-
ence is made by counsel.

### Deducting Debts from Credits.

The further question is raised as to whether appellant
company, in having its property assessed, is entitled to the
deduction of its *bona fide* debts from the credits listed by

it, as provided by the general Revenue law of the State.
Section 3 of the Revenue law provides that personal prop-
erty shall be valued at its fair cash value, less such deduc-
tions as shall be allowed by law to be made from credits.
Credits, whether payable in money, labor or property, are
taxable under the second paragraph of section 3 of the
Revenue act of 1872. (Hurd's Stat. 1913, p. 2025.) Sec-
tion 27 of this last named act provides that "in making up
the amount of credits which any person is required to list
for himself, or for any other person, company or corpora-
tion, he shall be entitled to deduct from the gross amount
of credits the amount of all *bona fide* debts owing by such
person, company or corporation to any other person, com-
pany or corporation, for a consideration received," etc.
Section 28 provides that "no person, company or corpora-
tion shall be entitled to any deduction from the amount of
any bonds, stocks, or money loaned," etc., requiring that
all intangible property be assessed under the description of
capital stock, the actual valuation of which must necessarily
take into account the balance between the credits and debts.
(Hurd's Stat. 1913, chap. 120, secs. 48, 108, pp. 2033,
2043.) This court, in *First Nat. Bank* v. *Holmes*, 246 Ill.
362, said (p. 369) that "it is not within the power of the
legislature to provide that different classes of property shall
be valued differently." As has already been stated in this
opinion, the property of appellant company must be as-
sessed by valuation, so that the company's constitutional
share, only, can be imposed for the State taxes. This con-
stitutional provision admits of no discrimination. (*Illi-
nois Central Railroad Co.* v. *County of McLean,* 17 Ill.
291; *People's Loan and Homestead Ass'n* v. *Keith,* 153
id. 609; *Consolidated Coal Co.* v. *Miller,* 236 id. 149.)
In *Boyer* v. *Boyer,* 113 U. S. 689, the court, in consider-
ing a claimed discrimination against national bank stock,
said (p. 695) : "That a State law which permits individ-

ual citizens to deduct their just debts from the valuation of their personal property of every kind, other than national bank shares, or which permits the tax-payer to deduct from the sum of his credits money at interest or other demands to the extent of his *bona fide* indebtedness, leaving the remainder to be taxed, while it denies the same right of deduction from the cash value of bank shares, operates to tax the latter at a greater rate than other moneyed capital," and held that such a provision discriminated against bank shares. To the same effect are *State Bank* v. *Board of Revenue,* 91 Ala. 217, and *Detroit Citizen's Street Railway Co.* v. *Common Council,* 125 Mich. 673.

But counsel for the State insist that the company has not brought itself within the provisions of the general Revenue law as construed by this court in *Peirce* v. *Carlock,* 224 Ill. 608, *Siegfried* v. *Raymond,* 190 id. 424, and *Sellars* v. *Barrett,* 185 id. 466, in order to be entitled to the deductions of debts from the credits for the year here in question. The company is not in the same situation as to this deduction as were the property owners in the cases just cited. In none of those cases did the property owners take the proper steps to have the deductions allowed, while here the company, upon forms prepared by the State Auditor, made its return, asking and demanding that its debts be deducted from its credits, as had been permitted and allowed under similar schedules for similar returns for the years from 1906 to 1912, immediately preceding the return of this schedule. Under the authorities and the rules heretofore laid down in this opinion as to the equality and uniformity required by the constitution in assessing and levying State taxes against the property of this company, it is entitled, under the provisions of the general Revenue law as well as under the provisions of the constitution, to the deduction of its *bona fide* debts from the credits, the same as other corporations and individuals.

*Separation of Charter and Non-Charter Line Property.*

The company has 705.5 miles of charter line railroad. Under due authority of law it has acquired additional lines of railroad other than its charter lines, some being held by fee title, some by lease and stock ownership and some controlled by stock ownership alone. These are called "non-charter lines." Including said non-charter lines, in the year 1913 said company directly operated as one system 4763 miles of railroad. These non-charter lines are in some score or more different States, west, north, south and east of Illinois. The total length of said non-charter lines of railroad in Illinois is about 1348 miles, all of which, except about 26.03 miles, are owned in fee by the company. It appears that on March 31, 1913, the company was possessed of a large amount of rolling stock, reasonably sufficient to equip said railroad owned and operated by it as one system; that said rolling stock consisted of 57,201 freight cars, 1038 passenger-train cars, 3373 work cars, 1460 locomotives, and other miscellaneous equipment; that part of said rolling stock was during the year 1913, and prior thereto, used exclusively on said charter lines; that the remainder was not assigned to specific portions of said railroad, either charter or non-charter lines, but was used in common on all parts of said railroad as the traffic conditions required; that said company, in listing its rolling stock with the Auditor of State in the year 1913, described all the rolling stock so owned by it at the time, and apportioned as the part thereof to be assessed as assets or property pertaining to said charter lines, percentages of said classes of rolling stock based upon the use thereof on said charter lines in comparison with the total use on said operated system as shown by the mileage made on said respective parts; that by said method said company, in said schedule filed with the Auditor, assigned as the part of the charter lines 28.57 per cent of the total locomotive value, 34.16 per cent of the total passenger-train car value, and

35.37 per cent of the total freight and other car value; that on said 31st day of March, 1913, said company owned and was in possession of a large amount of other tangible personal property, consisting of railroad supplies, steel rails, ties, bolts, plates, material for car and engine repairs, and other like classes of tangible property, a portion of which was intended for use on the charter lines and another portion of which was permanently located outside of Illinois in other States and intended for use upon said non-charter lines in other States; that said material outside of the State appeared never to have been upon the charter lines; that said company also held similar personal property on its charter lines for use thereon; that said property located in other States was not returned as taxable in this State on said schedule for 1913.

The State claims that under section 18 of the company's charter it was its duty to keep accurate accounts of the operation, expense, etc., of its non-charter lines for the purpose of fixing the proper amount of tax to be levied upon charter line property. The provision of section 18 requiring the company to keep accounts reads: "For the purpose of ascertaining the proceeds, receipts or income aforesaid, an accurate account shall be kept by said company." The record shows that the company has always had a system of keeping accounts in such a manner as to intend on its part to comply with said section 18. The proof shows that the State has at four different times,— in 1882, 1883, 1885 and 1899,—had a special accountant or commission examine the method of keeping the accounts of the company's gross proceeds and income of the charter lines and has in each instance approved the method used by the company; that the manner of keeping the accounts in 1913 did not differ materially from the method so approved by said State's representatives, except as the accounting rules now prescribed by the Inter-State Commerce Commission required a change. In *State* v. *Illinois Cen-*

*tral Railroad Co.* 246 Ill. 188, this court said (p. 240) : "The obligation rests upon appellee [the railroad company] to make true and accurate statements of its gross receipts to the State. In a proceeding of this kind the relations of the parties under this charter are such that the burden of proof rests upon appellee to show that such semi-annual statements are true and accurate." The court was there referring to the accounts that the company had expressly agreed to keep under the provisions of its charter. It was not held there that an account of expenses should be kept nor a distinct separation of property preserved in order that the Auditor of Public Accounts, as assessor, might the more conveniently assess the property. The keeping of detailed accounts, dividing every item of expense among the respective lines, would undoubtedly be exceedingly costly, and the proof shows that it has never been done or required nor the failure so to do criticised in any examination of the accounts. The company has a dual capacity in operating its charter and non-charter lines. It owns and operates the charter lines under the powers granted by its charter; it owns, possesses and operates the non-charter lines under the authority granted to it by general laws. Its duty to the former is no more absolute than its duty to equip and operate the non-charter lines. It is not intended here to hold that the company is keeping these accounts as the charter requires they should be kept so as to make a correct report to the State of the company's receipts and disbursements. We are here only considering what the duty of the company was in keeping these accounts to furnish a proper basis for assessing the State tax for the year in question.

The State contends that such intermingling of charter line equipment with non-charter line equipment as is here shown renders it impossible for the State Auditor to assess the property of the charter lines, and that therefore this case should be governed by the rules applicable to the wrongful intermingling of one person's goods of his own

business with the property and business of another person for whom he acts as agent and to whom he sustains some fiduciary relation; that the State Auditor, in levying the tax under such situation, should be authorized to treat as charter line property all the company's non-charter line property which is not affirmatively shown to be non-charter line property, under the reasoning of the following and other like cases: *Diversey* v. *Johnson,* 93 Ill. 547; *First Nat. Bank of Elgin* v. *Schween,* 127 id. 573; *Jewett* v. *Dringer,* 30 N. J. Eq. 291. We cannot so hold. None of these were tax cases. The State of Illinois authorized the company to operate and control its charter and non-charter lines, and whatever intermingling of the property there has been seems to be the result of proper performance of the duties of the company in conducting the business of the charter and non-charter lines. There has been no wrongful intermixture of the property or business of the two classes of lines. The tax-payer manifestly does not occupy any such fiduciary relation to the assessor as was occupied by the parties in the authorities relied on by counsel for the State. This is not a suit in equity, such as *State* v. *Illinois Central Railroad Co.* 246 Ill. 188, but a proceeding to establish a value on property for the purpose of taxation. There was no other or different burden upon the company than upon any other tax-payer to furnish a correct list and valuation of the property except as may be specifically provided in said charter of the company and said act of 1859, and the provisions there found on this point do not differ materially from those in the general Revenue law. The said act of 1859 authorized the Auditor, for the purpose of placing a value upon the property, to inspect the books of the company and examine any of its officers or employees or take any evidence "by which to make out a proper list and valuation." It is the duty of the company to make a return in its schedule of all its charter line property at its fair cash value, and, if the State

Auditor is not satisfied with that schedule, to furnish that official with every reasonable facility to ascertain what is charter line property and its value, but we find nothing in the charter provisions or under the general provisions of the Revenue law, in the light of the proof in this record, that would justify the Auditor in assessing arbitrarily the property used on the non-charter lines as charter line property. Moreover, we think it is affirmatively shown by the proof taken before the commissioner that the company had returned in its schedule to the State Auditor on all classes of property, except tangible property other than rolling stock, the fair proportion of all the property of the charter and non-charter lines taxable as charter line property. As we understand the argument of counsel for the State, they contend that notwithstanding the total amount of rolling stock and other property of the company many times exceeds the requirements of the charter lines and that it is, in part, taxed for the non-charter lines, yet all the property owned by the company in use both on charter and non-charter lines must be included in this assessment. The rule sought by counsel to be enforced here is not as to the just apportionment of the earnings between the charter and non-charter lines under the special terms of the company's charter, but whether all the equipment used in common may be arbitrarily included in the tax assessment of the charter lines because of possible difficulties that may arise in charter receipts accounting.

*Valuation of Railroad Track and Right of Way.*

A question that has been argued at length in the briefs is the method of valuing the tangible property of the company and the value which should be put upon it, whatever method is adopted. Section 22 of the charter requires that an annual tax shall be levied by the Auditor upon all the property and assets, of every name, kind and description, belonging to such corporation. The largest single item of

tangible property is the railroad track of the charter lines, which the commissioner found to be 705.5 miles in length. He placed the fair cash value of this railroad track on March 31, 1913, at $75,000,000. The Auditor assessed the charter line railroad track at $125,000,000. The company, for the year 1913, on the form of schedule prepared by the State Auditor, returned to that official, among other items therein required, the aggregate value of the railroad track of the charter lines to be assessed, as $101,776,098. On the hearing before the commissioner much evidence was presented as to the proper method of valuing this charter line railroad track. Several expert witnesses familiar with the value of railroads testified as to the value of such charter line track and right of way. Testimony was given as to the market price on sales of stock and bonds of the company at the date in question. Evidence was also heard as to the value of this property, deduced, under the evidence, from the value of the company's operated system, and as to the value based upon the "cost of production less depreciation." Evidence was also heard as to other methods of valuing. In the view we take of this question the company is not in a position to claim that its property known as railroad track is of less value than that fixed in the return to the Auditor of Public Accounts for said year 1913. Proof was offered as to how this valuation was arrived at by the company in its return. This, we think, is not the material question. The authorities in this State, as well as the weight of authorities in other States, are to the effect that a tax-payer is bound by his own statements as to the nature, title and value of the property made in the list which he returns for taxation. "In the absence of any evidence of fraud, accident or mistake, a property owner is bound by a schedule of his taxable personalty given by him to the assessor." (1 Cooley on Taxation,—3d ed.—618; 37 Cyc. 994, and cases cited; 27 Am. & Eng. Ency. of Law,—2d ed.—671, and cited

cases.)    This court held in *People* v. *Atkinson,* 103 Ill. 45,
that where a person makes out and delivers to the assessor
of the town in which he keeps his business office, a schedule
of the amount, quantity and quality of his personal prop-
erty required to be listed for such taxation, he will be
bound by such return though a portion of the property is
required to be returned by him to the assessor of a dif-
ferent town where he is also assessed, the court saying
that it was a safe rule to hold that where a person makes
out and delivers to the assessor the amount, quantity and
quality of his personal property he should be bound by such
return.    In *Peoria, Decatur and Evansville Railway Co.* v.
*Goar,* 118 Ill. 134, the court held that where the railroad
company had made a mistake in not properly including
what was really railroad track the mistake could be cor-
rected later by court proceedings, but this decision in this
respect was subsequently overruled in the case of *Iowa
Central Railway Co.* v. *People,* 156 Ill. 373, this court
there holding the State Board of Equalization was not au-
thorized to assess as right of way of a railroad company,
real estate included in the schedule filed by the company
with the county clerk as not being railroad track, saying
(p. 375) :  "We think that appellant is bound by the state-
ment made in the schedule filed with the county clerk.
*   *   *   It was not the intention of the legislature to
clothe the local assessor with the power to assess railroad
land or not, according to his own view of the question
whether it is railroad track or real estate other than rail-
road track.    In harmony with these views we said in *In-
dianapolis and St. Louis Railway Co.* v. *People,* 130 Ill.
62: 'It was the duty of the company to make a true re-
turn of its property, and both the State board and the
local assessor had a right to act upon the supposition that
it had honestly discharged that duty.'    Still again, in the
more recent case of *Cairo, Vincennes and Chicago Rail-
way Co.* v. *Mathews,* 152 Ill. 153, we said : 'It was the

duty of appellant,  *  *  *  under sections 40 and 41 of
the Revenue act, to make out and file with the county
clerk a statement or schedule showing the property held
for right of way, etc.   It is to be presumed that it per-
formed this duty, and that the county officials relied upon
the statement or schedule filed, as an accurate description
of the right of way.' "  In *Dennison* v. *County Comrs.* 153
Ill. 516, the court held that a tax-payer was bound by
his voluntary return to the assessor, and, there being no
evidence of fraud, accident or mistake, the county board
could not relieve him because such schedule included prop-
erty that could not legally be assessed.   (See, also, to the
same effect, *Tolman* v. *Raymond,* 202 Ill. 197.)   This
same rule has been adopted in the following among other
cases:  *Inland Lumber and Timber Co.* v. *Thompson,* 11
Ida. 508; *State* v. *Northern Trust Co.* 73 Minn. 70; *Cen-
tral Pacific Railroad Co.* v. *California,* 162 U. S. 91; *Ad-
ams Express Co.* v. *Ohio,* 166 id. 185; *City of Waterbury*
v. *O'Laughlin,* 79 Conn. 630; *Randell* v. *City of Bridge-
port,* 63 id. 321; *Greenwoods Co.* v. *Town of New Hart-
ford,* 65 id. 461; *Hunt* v. *Turner,* 54 Fla. 654; *City of
Tampa* v. *Mugge,* 40 id. 326; *Slimmer* v. *Chickazwa Co.*
140 Iowa, 448.   In several of these cases the decisions of
our court heretofore cited have been quoted with approval
on this question.

The public has an interest in the collection of taxes
from every property owner.   The rule that the property
owner cannot question the correctness of his schedule is
not grounded upon the doctrine of estoppel as that doctrine
is ordinarily applied.   The decisions in the cases cited do
not rest upon the usual principles of estoppel nor contain
the elements usually required in courts of equity in the ap-
plication of that doctrine.   They seem to rest rather upon
the principle that it is the duty of the tax-payer to see
that the list of property is furnished to the proper officers,
and that it is against public policy to permit him to make

such schedule and then question its accuracy, whether the failure to certify the proper list of property was intentional or unintentional. The rule in this State being in accord with this reasoning, there can be no relief for an incorrect schedule, in the absence of fraud, accident or mistake. Counsel for the company argue that these authorities are not in accord with the authorities in certain other jurisdictions. This is true. In some of those jurisdictions the courts recognize plainly the fact that our decisions are not in accord with the rules laid down by certain other courts.

Counsel for the company further argue that the decisions already cited are grounded on the fact that the schedule of the property owner is binding because he has misled the public officials, but that in this case the public officials have not been in any way misled, as the State Auditor did not follow the schedule of values. As already stated, the rule laid down in this State is not based on the doctrine of estoppel. The Connecticut cases heretofore cited are practically on all-fours with the facts as here presented, and it was there held that even though the assessing authority had seen fit to raise the value fixed by the property owner, the court, when it finally passed on the value, would not fix the valuation lower than that fixed in the return of the property owner. Here the vice-president of the company signed and swore to the correctness of the schedule returned to the State Auditor, and the statement of this official was the statement of the corporation. No claim can be made that the erroneous valuation of this railroad track and right of way was due to any fraud, accident or mistake, as those terms are used in the law, it being contended only that the railroad official who made up the schedule adopted the wrong theory for fixing the value of the railroad track and right of way, making the cost of reproduction, less depreciation, the basis of his valuation, and it is now insisted by counsel for the company that this is not a proper basis upon which to figure the actual cash

value of the railroad track and right of way. The commissioner found that it was not the proper basis, and the weight of proof in this record tends to support that conclusion. But even though, as an original question, the conclusion of the commissioner on this point is correct it can not control here, in view of the rule of law in this State that the tax-payer who lists his property for taxation, in the absence of fraud, accident or mistake, is bound by the valuation given in such list or schedule.

Counsel for the company seem to argue that the law does not require it to value its property in making the return to the State Auditor, and therefore its schedule can not be binding. In this we think they are in error. Section 22 of its charter required that the president, secretary or other officer should list the stock, property and assets belonging to said company with the Auditor. Section 3 of said act of 1859 requires that said railroad company "shall list their stock, property and assets, as required by section 22 of their charter, with the Auditor of Public Accounts, and if the Auditor shall believe that the valuation thereof is too low, or that the whole of the stock, property and assets, owned by said company, other," etc. Section 8 of said act of 1859 provides "that the terms 'list' and 'valuation,' as used in this act, shall be deemed and taken to mean the stock, property, assets and other things owned by said company, set down in a list or schedule for taxation, and the value placed thereon, as above provided." The evidence shows that for the years from 1906 to 1912, inclusive, the company made its returns to the State Auditor on a schedule form similar to the one here under consideration for 1913, and that in each schedule it gave the value of the various items of property in a manner similar to that in which it was given on this schedule. The aggregate total cash value for extending the tax on the railroad tracks and right of way of the charter lines should be the amount in such schedule returned,—that is, $101,776,098.

*Valuation of Rolling Stock for purpose of Assessment.*

The value of all the rolling stock of charter and non-charter lines is $42,675,857. The State Auditor held that this entire amount should be the aggregate or full cash value of the rolling stock to be assessed. The company in its return to the State Auditor gave the full cash value of the rolling stock as $14,095,530, and the commissioner, after a review of the evidence taken before him, held that this sum represented the fair proportion of said total rolling stock and its value assessable to the said charter lines. While the general rule is that the situs of personal property follows the domicile of the owner, it is a rule of convenience, subject to legislative change, and is not ordinarily applied to property distributed along an extended railroad system. It may well be doubted whether it can reasonably be applied to such property of a railroad corporation as between the different localities along its line of road. The general rule that personal property follows the domicile of the owner, after all is "merely the law of the State which recognizes it, and when it is called into operation as to property located in one State and owned by a resident of another, it is a rule of comity in the former State rather than an absolute principle in all cases." *State Railroad Tax cases,* 92 U. S. 575.

Section 45 of the general Revenue law of this State provides that "the rolling stock shall be listed and taxed in the several counties, towns, villages, districts and cities, in the proportion that the length of the main track used or operated in such county, town, village, district or city bears to the whole length of the road used or operated by such person, company or corporation, whether owned or leased by him or them in whole or in part. Said list or schedule shall set forth the number of miles of main track on which said rolling stock is used in the State of Illinois, and the number of miles of main track on which said rolling stock is used elsewhere." (Hurd's Stat. 1913, p. 2033.) In con-

struing this statute this court held in *Ohio and Mississippi Railroad Co.* v. *Weber,* 96 Ill. 443, on page 450, that the plain object of this statute "is to subject each railroad company in this State to taxation in proportion to the value of all of its property subject to taxation in this State, whether tangible or intangible, real, personal or mixed, embracing, among other kinds of property, the franchises exercised within or granted by this State." The court further held that it could not be inferred that the State Board of Equalization acted corruptly merely from the fact that it held that such a distribution was in proportion to the mileage of the corporation lying in the district where the tax was to be levied. In *Pullman's Palace Car Co.* v. *Pennsylvania,* 141 U. S. 18, where the statute of a State imposed a tax upon the capital stock of all corporations engaged in the transportation of freight or passengers in the State, it was held that a corporation engaged in running railroad cars into, through and out of the State, and having at all times a large number of cars within the State, might be taxed by taking as the basis of assessment such proportion of its capital stock as the number of miles of railroad over which its cars were run within the State bore to the whole number of miles in all the States over which its cars were run. In *American Refrigerator Transit Co.* v. *Hall,* 174 U. S. 70, where the proof showed that the cars used by the company in the State of Colorado were not continuously the same but were constantly changing, according to the exigencies of the business, it was held that the State tax "may be fixed by an appraisement and valuation of the average amount of the property thus habitually used and employed." In *Union Refrigerator Transit Co.* v. *Kentucky,* 199 U. S. 194, the defendant, a Kentucky corporation, owned two thousand cars, which it employed by renting them to shippers for the carriage of freight in the various States. A Kentucky statute provided that "all real and personal estate within this State, and all personal es-

tate of persons residing in this State, and of all corporations organized under the laws of this State, whether the property be in or out of this State, * * * shall be subject to taxation." The assessment was made on all the cars of the company though the greater number were at the time in use in other States. It was held that this amounted to a deprivation of property without due process of law. The court said (p. 206) : "The arguments in favor of the taxation of intangible property at the domicile of the owner have no application to tangible property. The fact that such property is visible, easily found and difficult to conceal and the tax readily collectible, is so cogent an argument for its taxation at its situs that of late there is a general concensus of opinion that it is taxable in the State where it is permanently located and employed and where it receives its entire protection, irrespective of the domicile of the owner. We have, ourselves, held in a number of cases that such property permanently located in a State other than that of its owner is taxable there. * * * We have also held that if a corporation be engaged in running railroad cars into, through and out of the State and having at all times a large number of cars within the State, it may be taxed by taking as the basis of assessment such proportion of its capital stock as the number of miles of railroad over which its cars are run within the State bears to the whole number of miles in all the States over which its cars are run. * * * There are doubtless cases in the State reports announcing the principle that the ancient maxim of *mobilia sequuntur personam* still applies to personal property and that it may be taxed at the domicile of the owner, but upon examination they all, or nearly all, relate to intangible property, such as stocks, bonds, notes and other choses in action. * * * But in view of the enormous increase of such [tangible personal] property since the introduction of railways and the growth of manufactures, the tendency has been in re-

cent years to treat it as having a situs of its own for the purpose of taxation, and correlatively to exempt at the domicile of its owner."

We deem it unnecessary to quote from the many other authorities referred to in the briefs on this question. Said section 45 of the Revenue law and all the authorities seem to be in accord that only that proportion of the rolling stock that the proof here showed was habitually used or employed within this State, found in accordance with the rules here laid down, should be included in the aggregate cash value of said rolling stock for the levying of the said tax. Counsel for the State insist that the full valuation should be taken for assessing purposes. The commissioner found that the portion of the rolling stock that should be assessed amounted to $14,095,530. Counsel for the company agree that this is the correct amount. The proof in this record shows very clearly, in our judgment, that this amount is the valuation of the proper proportion of the rolling stock that should be assessable as charter line property. This is also the value in the schedule returned by the company. According to the authorities heretofore cited, the conclusion necessarily follows that this is the amount that should be taken as the total aggregate cash value of the rolling stock for the purpose of levying the State tax.

### *Valuation of Tangible Personal Property other than Rolling Stock.*

Under the advice of counsel, the State Auditor, in assessing this class of property, assessed all that was owned by the company, wherever situated, the total aggregate cash value being $6,982,517.18. It is now conceded by counsel for the State that under the decisions already cited and numerous other decisions of the Federal and other courts, such as *Delaware, Lackawanna and Western Railroad Co. v. Pennsylvania,* 198 U. S. 341, *Buck v. Beach,* 206 id. 392, *Selliger v. Kentucky,* 213 id. 200, and *Irvin v. New Or-*

*leans, St. Louis and. Chicago Railroad Co.* 94 Ill. 105, the proof showing that a large proportion of the materials and supplies had obtained a permanent situs at points not in any way connected with the charter lines of the company, such property so located outside of the State should not be included as charter line property for the purpose of levying a tax in this State. The valuation of this property is higher in the commissioner's report than it is in the return of the company to the State Auditor. The commissioner found the value to be $4,420,115.54; its value as returned in the schedule of the company was $2,585,675. Under the law the State is not bound by a valuation given by the property owner to the assessing officer. (1 Cooley on Taxation,—3d ed.—616, and cited cases; 37 Cyc. 994, and cited cases.) The State contends that while the Auditor's valuation for the assessment of this property is too high the commissioner's is too low. We think the weight of the evidence supports the finding of the commissioner. His finding, therefore, will be taken as the full cash value for this property for the State tax for the year here in question. By the great weight of evidence in this record none of the items of property of the company, except the one considered under this heading, should be valued at a higher figure than was fixed thereon in said schedule of the company returned to the State Auditor for the year 1913, as herein set forth.

### Valuation of Intangible Property.

Under this heading the State Auditor valued and assessed cash, bonds, stocks and other credits. The commissioner, after he had heard evidence, made his report on this branch of the case under eleven different subdivisions or headings. As to the first, second, fourth, fifth, seventh, eighth, ninth and tenth subdivisions, counsel agree that the commissioner found correctly that the various items under these subdivisions should not be assessed by the State Aud-

itor as charter line property, though there is a disagreement between counsel as to whether or not some of the items in these subdivisions should be assessed by the local assessors under the general Revenue law of the State. The questions of taxation as to practically all the items under these subdivisions are, so far as this cause is concerned, moot questions and need not be decided. There is, however, a difference of opinion as to the proper method of taxing items under subdivision 3, especially as to whether the company had the right to set off debts against credits, which the commissioner held it had, and also a difference of opinion between counsel as to the commissioner's findings as to subdivision 6 and subdivision 11. In view of the conclusions that we have reached on other branches of this case no practical purpose can be served in this opinion by giving our views of the law as to the proper rules for levying taxes on any of these items. It appears as to the items in some of these subdivisions that there is now other litigation in which the question of proper methods of taxation is squarely at issue and must be settled to end that litigation. Indeed, considerable space in these briefs on this question is devoted to argument to prevent the court from pre-judging the questions involved in the other litigation. The State Auditor placed the fair cash value on cash, stock, bonds and other credits at $190,901,243.05. In the return of the schedule of the company to the State Auditor the aggregate value of this class of property to be assessed against the charter lines was given as $70,728,290.49. The commissioner valued this class of property for assessment at $23,950,993.40. Counsel for the company now insist that proof before the commissioner requires this class of property to be valued at $3,391,391.83, while counsel for the State insist that the proof in this record shows that this property should be valued for assessing purposes at $16,329,588.89.

The conclusion heretofore stated, that the valuation given in its schedule as to the railroad track and right of way returned to the Auditor for the year 1913 must bind the company, applies as to the value of the intangible personal property. The evidence in the record tends to show that these returns were made on forms prepared by the State Auditor, and included much property, especially intangible personal property, that did not belong to the charter lines. Similar returns had been made for some seven years previous on the same forms by the company to the State Auditor and the State taxes levied by that officer in accordance with said returns. Even though it be a fact that the company included in this schedule property that did not belong to the charter lines, that fact cannot alter the rule of law as to the binding effect in this case upon the company of the values fixed in the schedule for the assessment of the State tax for the year in question. The valuation given to the intangible personal property in the company's schedule for 1913, namely, $70,728,290.49, is binding upon the company, and should be the total aggregate cash value of this item of the company's property for the purpose of levying the State tax.

———

Both counsel in their briefs and arguments have discussed at length various points which we have not deemed it necessary to consider. Having in mind the fact that there is another cause in litigation wherein the question is involved as to a proper accounting between the State and the company under the rules laid down by this court in *State* v. *Illinois Central Railroad Co.* 246 Ill. 188, counsel have stated in their briefs that they do not desire the court, without fully considering its bearing on the litigation for an accounting, to say anything in this opinion that would, directly or indirectly, affect a decision in that case, and they have argued here at some length questions that arise only

in the litigation for an accounting. The issues there differ so widely from those we are considering, that anything that is said in this opinion should not have the slightest bearing on the issues in the litigation for an accounting. That cause, if it ever reaches this court, will be decided, both on the law and the facts, without any prejudice to either party by reason of the conclusions we have reached in this cause.

### Recapitulation.

The aggregate values that have been or are now placed upon the property of the company by the various authorities, before those values are equalized under the rules heretofore laid down in this opinion, are as follows:

| | State Auditor's Valuation. | Counsel for State Estimates. | Commissioner's Findings. | Counsel for Company Estimates. | Company's Schedule to Auditor. | Aggregate Cash Values Which Should Be Taken. |
|---|---|---|---|---|---|---|
| Right of way and improvements thereon, including railroad track........ | $125,000,000.00 | $111,986,966.38 | $75,000,000.00 | $75,000,000.00 | $101,776,098.00 | $101,776,098.00 |
| Rolling stock........ | 42,675,857.00 | 42,675,857.00 | 14,095,530.00 | 14,095,530.00 | 14,095,530.00 | 14,095,530.00 |
| Tangible personal property other than rolling stock. | 6,982,517.18 | 4,687,790.35 | 4,420,115.54 | 4,420,115.54 | 2,585,675.00 | 4,420,115.54 |
| Intangible property, including cash, stocks, bonds and other credits........ | 190,901,243.05 | 16,329,588.89 | 23,950,993.40 | 3,391,391.83 | 70,728,290.49 | 70,728,290.49 |
| Total.......... | $365,559,617.23 | $175,680,202.62 | $117,466,638.94 | $96,907,037.37 | $189,185,593.49 | $191,020,034.03 |

It is proper to state here that the aggregate value of all the property and assets of the company as returned by it in its schedules to the State Auditor for the various years from 1906 to 1912, inclusive, and which the State Auditor took as a basis in fixing the assessment for the State tax in accordance with the rules laid down herein, varies in these different years from $155,016,656.50 to $182,067,092.55.

In view of the conclusions that we have reached, the total aggregate cash value of the property of the company to be assessed as of March 31, 1913, should be in accordance with the figures set forth in the last column of the table given above,—that is, $191,020,034.03. The Auditor of Public Accounts, in assessing the tax thereon for State purposes, must proceed in accordance with the views set forth in this opinion. He must equalize its value on the same basis as has been applied to the other property throughout the State for assessing the taxes for the year 1913,—that is, to 70 per cent of said aggregate cash value,—making such equalized value $133,714,023.82. In harmony with the general Revenue law of this State and under the reasoning of this opinion, only one-third of said total equalized value,— that is, $44,571,341.27,—should be taken by the Auditor as the value upon which said State taxes against the company should be assessed, and said State taxes should be assessed at the rate fixed by the State for other State taxes for that year,—that is, seventy cents on each $100 of valuation. The clerk of this court will certify to the Auditor of Public Accounts the aggregate cash value as found by this court,—that is, $191,020,034.03.

*Ordered certified accordingly.*