(No. 26463.—

ANTHONY W. DALY *et al.* Appellants, *vs.* THE COUNTY OF MADISON *et al.* Appellees.

*Opinion filed November 24, 1941.*

ANTHONY W. DALY, and EMERSON BAETZ, for appellants.

GEORGE F. BARRETT, Attorney General, and C. W. BURTON, State's Attorney, (P. C. OTWELL, and HAROLD TALLEY, of counsel,) for appellees.

Mr. JUSTICE SMITH delivered the opinion of the court:

Appellants, Anthony W. Daly, Frances Beiser and Gene Randall, are citizens and taxpayers residing in Madison county. In this cause they filed a petition in the circuit court of that county under the act relating to suits by taxpayers to restrain the disbursement of public moneys. (Ill. Rev. Stat. 1941, chap. 102, pars. 11-17.) With their petition they presented the complaint which they asked leave to file. This complaint named as defendants the county of Madison and the county clerk, county treasurer and county

auditor of that county. The Secretary of State, Auditor of Public Accounts and State Treasurer of the State of Illinois were also named as defendants. Notice of the filing of the petition and the date on which the same would be heard was given according to law. Upon such hearing the court denied leave to file the complaint. From the order denying such leave, appellants have perfected this direct appeal.

By the complaint it was alleged, in substance, that the Congressional Apportionment act of 1901, (Ill. Rev. Stat. 1941, chap. 46, pars. 154-156,) by reason of changes in the population in the several districts created, under the present existing conditions as to population violates various provisions of the State and Federal constitutions. It was also alleged that said act is in conflict with certain acts of Congress relating to the election of members of the House of Representatives in the national Congress. For the purpose of determining the right of appellants to file the complaint, the facts set out in the petition and the complaint as distinguished from conclusions, must be accepted as true. *Lund* v. *Horner,* 375 Ill. 303; *Greenfield* v. *Russel,* 292 id. 392.

The gravamen of appellants' contention as to the invalidity of the act, is the inequality of elections inherent therein as applied to present population distributions. This inequality, the complaint alleges, makes the act void and the expenditure of public funds thereunder unlawful. The complaint states that the Secretary of State in due course will receive petitions for the nomination of candidates for representatives to Congress from the various districts created by the 1901 act; that he will thereupon certify the names of such candidates to the several county clerks throughout the State; that, unless restrained, the Secretary of State, with the Auditor of Public Accounts and the State Treasurer, will expend funds from the State treasury for these and other enumerated purposes in connection with the

primary and general election to be held in 1942 under the ·act. The complaint further states that, unless restrained, the county clerk of Madison county, together with the county board and other county officials who are made defendants, will pay the expenses in Madison county of the primary and the election to be held in 1942 under the act, from the treasury of that county. That public funds in the hands of the State Treasurer and the county treasurer, to which appellants have contributed by the payment of taxes, will be wasted and dissipated. The complaint prays that the act be declared invalid and appellees enjoined from the use of public funds in carrying out its provisions. It is further charged that the act violates the State constitution because, as applied to the existing population of the districts, it violates section 18 of article 2, which is a guaranty that "All elections shall be free and equal." The complaint sets out the population of each of the twenty-five districts established by the act, as determined by the 1940 census.

The total population of the State is alleged to be 7,897,241. The complaint further alleges that the districts are unequal in population, and that an election held in these districts will not be equal under said constitutional guaranty. It is averred that the fifth district, which has the smallest number of inhabitants, contains only 112,116 people, and that the seventh district, which is the largest, contains 914,053 inhabitants. It is pointed out that in the twenty-second district, in which the county of Madison is located, it requires 3.205 votes to equal one vote cast in the fifth district; that there are twenty-three districts which contain more than twenty-five per cent more inhabitants than the fifth district; twenty-one districts which contain over fifty per cent more inhabitants than the fifth district; eighteen districts which contain more than ninety per cent more than the fifth district; fourteen districts which contain more than double the number of the inhabitants in the

fifth district; that there are seven districts which have more than three times the number of inhabitants in the fifth district; that there are five districts which have more than five times the number of inhabitants in the fifth district, and that one district, the seventh, has more than eight times the number of inhabitants residing in the fifth district. In the seventh district, it is alleged that it requires 8.153 votes to equal the vote of one voter voting in the fifth district. Seven of the entire twenty-five districts are alleged to have an excessive number of inhabitants, while fifteen districts have an unreasonably small number of inhabitants. It is stated that if the population of the whole State be divided by twenty-six (the number of congressmen apportioned to the State) the ratio to population would be 303,740, whereas, the fifth district has only 112,116 inhabitants and the seventh district has 914,053.

Appellants, as taxpayers, base their right to bring and maintain the suit on the ground that, because of the alleged invalidity of said act, any expenditures of public funds for the purpose of holding a primary or an election 'for the districts created by the act will constitute the use of public funds for unlawful purposes. Anticipating, with commendable frankness, the difficulties with which they were sure to be confronted on account of several prior decisions of this court, it is speciously argued that this is not a suit either to enjoin the holding of an election or to coerce legislation. Notwithstanding the earnestness with which this assertion is made and often repeated, we cannot close our eyes to the fact that to grant appellants the relief which they ask would indirectly result in the exact situation which they assert will be avoided. This court cannot overlook the fact that to enjoin the use of public funds for the purpose of holding an election is, in effect, little short of indirectly enjoining the holding of such election. Equally, to enjoin the use of public funds for the purpose of paying

the expenses of holding a primary or an election under the Congressional Apportionment act of 1901, would create a situation that would render the passage of legislation by the General Assembly indispensable. Regardless of the habiliments in which the questions are presented, the result would be exactly the same.

That the courts have no power to prevent the holding of an election at the suit of a taxpayer, is settled by the decisions of this court. (*Fletcher* v. *City of Paris*, 377 Ill. 89; *Payne* v. *Emmerson*, 290 id. 490; *Spies* v. *Byers*, 287 id. 627; *People* v. *McWeeney*, 259 id. 161; *People* v. *Barrett*, 203 id. 99; *Harris* v. *Schryock*, 82 id. 119.) The subject of the right of taxpayers to compel or coerce the legislature to enact laws is equally well settled. This is not a new question in this State. It has been unsuccessfully attempted by *quo warranto* (*People* v. *Blackwell*, 342 Ill. 223); by injunction (*Fergus* v. *Kinney*, 333 Ill. 437) and by *mandamus*. (*Fergus* v. *Marks*, 321 Ill. 510.) Neither can the courts pass on a purely political question. This is definitely settled on incontestable principles of equity jurisdiction and procedure.

Appellants place great reliance on the case of *Moran* v. *Bowley*, 347 Ill. 148. While that case is authority for the maintenance of a suit by taxpayers to enjoin the expenditure of public funds in proper cases, it must be said that most of the arguments found in that opinion in support of the conclusion reached that the act there involved was invalid, have been rendered innocuous by the decisions of the Supreme Court of the United States in *Wood* v. *Broom*, 287 U. S. 1, and *Smiley* v. *Holm*, 285 U. S. 355.

The case of *Moran* v. *Bowley, supra,* held that the provisions of the 1911 act of Congress (2 U. S. C. A. sec. 3) which required that "Representatives to Congress shall be elected by districts composed of a contiguous and compact territory, and containing as nearly as practicable an equal

number of inhabitants," were not superseded by the 1929 act (2 U. S. C. A. 2a) but were still in force; that the 1931 Apportionment act enacted by the legislature of this State, was invalid under said act of Congress because of the inequality in population of the several districts created. In the course of the opinion, in support of the conclusions reached, it was said: "If the act of 1929 restored to the States all power over the election of congressmen except the fixing of the numbers accorded to them, nothing would prevent some States from electing their congressmen by the people at large and other States from electing them by districts. Nothing would restrain a State from electing more than one congressman from each district, or for example, nothing would inhibit the legislature of the State of Illinois from dividing the State into two congressional districts, so that Cook county would be one from which a fixed number of congressmen would be elected and the other district would comprise the rest of the State from which the remainder of the congressmen would be elected. If the legislature is not bound by any law, as defendants claim, it could apportion the whole number of congressmen between the two districts without any regard to population." Following that decision, the Supreme Court of the United States held in *Wood* v. *Broom, supra,* that said provisions of the 1911 act of Congress expired by their own limitation upon the passage of the 1929 act. The result of such holding was to vitalize and render operative the above language in the opinion in *Moran* v. *Bowley, supra,* and to effectuate the holding that there were no Federal restrictions or limitations on the legislature in the apportionment of the State for the election of representatives to the House of Representatives in the Congress of the United States. This eliminates any question as to any duty being imposed upon the legislature to provide for the election of congressmen from districts composed of con-

tiguous and compact territory, and the preservation of equality as to the number of inhabitants contained therein, under the Federal statutes.

That there is nothing in the fourteenth amendment which would render invalid congressional districts created by State legislation, on the ground that they are unequal in population, was settled by the decision of the Supreme Court of the United States in *Wood* v. *Broom, supra*. It was there held that the only Federal requirements as to equality in population were contained in the act of Congress of 1911, which expired by their own limitation with the passage of the act of 1929. It follows that unless some such restrictions or limitations are found in our own constitution, the legislature is free to create districts without reference to equality in population.

From these preliminary observations it is apparent that we are met at the threshhold of the inquiry with the question of the right of appellants, as taxpayers, to institute or maintain a suit of this character. The theory on which taxpayers are allowed to maintain suits to enjoin the expenditure of public funds is that they have a property right in the public treasury by virtue of their past and future tax payments, as contributions to those funds, which property right will be damaged if the funds are used for unlawful purposes. It is fundamental that it is not within the jurisdiction of a court of equity to interfere with the public duties of the officers and departments of government. (*Chicago Public Stock Exchange* v. *McClaughry*, 148 Ill. 372.) Such jurisdiction extends only to the protection and maintenance of civil rights,—property rights,— as distinguished from political rights. (*Heffran* v. *Hutchins*, 160 Ill. 550; *Sheridan* v. *Colvin*, 78 id. 237; *City of Chicago* v. *Wright*, 69 id. 318.) Courts of equity deal only with civil and property rights and their powers do not extend to the determination of what laws are valid or invalid, unless such determination is incidental to the pro-

tection of property rights, recognized by courts of equity, alone. (*City of Chicago* v. *Chicago City Railway Co.* 222 Ill. 560.) A recurrence to this fundamental principle demonstrates that taxpayers can only maintain a suit of this character for the protection of their own civil and property rights, as distinguished from political rights.

That the questions here involved are purely political is apparent from the arguments made by appellants in support of their contention that the 1901 Congressional Apportionment act is invalid. One of the arguments made is that the fourteenth amendment to the Federal constitution provides that when a State shall abridge the right of its male inhabitants over twenty-one years of age, to vote, the number of representatives to Congress apportioned to that State shall be reduced in proportion to the number of citizens thus affected. It is argued that since half of the citizens of Illinois reside in congressional districts exceeding in population the average of all districts in the State, their right of suffrage has thus been abridged and that as a result of this constitutional provision the State of Illinois is only entitled to thirteen members of the House of Representatives, instead of twenty-six. This contention involves nothing but a political right. As such it is a matter solely for the determination of the Congress of the United States. We are not impressed with the argument that the inequality in population of the districts created by the act of 1901, resulting from a normal shifting of population, constitutes an abridgement of the right of suffrage within this provision of the Federal constitution. The history of the provision relied upon is interesting. An extended reference, however, to its historical background would serve no purpose here except to unduly extend this opinion. Its primary purpose was to prevent an abridgement of the right of suffrage of a class of citizens who had been recently freed from involuntary servitude and given the right of suffrage. The right intended to be protected by that pro-

vision of the constitution refers to the right to vote as established by the laws and constitution of the State. (*McPherson* v. *Blacker,* 146 U. S. 1, 36 L. ed. p. 869.) It has no practical bearing on the situation to which appellants attempt to apply it in this case.

No case supporting the rule contended for has been cited, and we have found none. The cases cited by appellants, holding that a statute may be valid when applied to the facts existing in one case, and invalid under the facts of another, obviously have no application. That rule, of course, is well settled and universally recognized. The novelty of the contention here made justifies a reference to the cases cited which it is claimed support the argument.

The case of *Poindexter* v. *Greenhow,* 114 U. S. 270, involved the validity of a statute of the State of Virginia. In 1871, certain coupon bonds were issued by statutory authority. The statute then in existence provided that the coupons should be accepted at or after maturity by tax collectors in payment of all taxes. In 1882, another statute was passed which provided that if the tax collector refused to accept the coupons, the taxpayer was given a remedy by *mandamus* to compel him to do so. It further provided that in case of such refusal the taxpayer was required to pay his taxes in money and when the genuineness of the coupons was established, the money paid by him in the discharge of his taxes should be refunded. The plaintiff tendered coupons in payment of his taxes, which were refused. His personal property was distrained for delinquent taxes. The act of 1882 was amended in 1884. The unconstitutionality of the act of 1882, and the amendment of 1884, was asserted on the ground that they violated the obligations of contracts. This contention was sustained by the court. The court held the acts invalid but stated in the course of the opinion that it was no objection to the remedy in such cases, that the statute whose application in the particular case is sought to be restrained is not void on its

face, but is complained of only because its operation in the particular instance works a violation of a constitutional right and is only invalid as applied to the facts in the particular case. There were no changes of circumstances involved. There was no question of a statute, valid when enacted, becoming invalid because of changes in population or other conditions.

The case of *Perrin v. United States*, 232 U. S. 478, involved a treaty with a tribe of Sioux Indians. Under this treaty a portion of their reservation was ceded to the United States on the condition that Congress would prohibit the sale of liquor on the lands ceded. In compliance with the treaty suitable legislation was passed. Perrin subsequently acquired some of the land so ceded. He was convicted of selling liquor in violation of this statute. He contested its validity and alleged that the changes in conditions since the act was passed had rendered it invalid. The court, however, sustained the validity of the act and upheld the conviction. It was said in the course of the opinion, that future conditions might become so changed as to render the prohibition inoperative. But no such changes were found to then exist which would warrant the court in holding the statute invalid.

The case of *Kansas City Southern Railway Co. v. Anderson*, 233 U. S. 325, involved the validity of a statute of the State of Arkansas. There the court simply announced the rule that a statute might be valid when applied to one set of facts and invalid as to another.

The case of *Abie State Bank v. Weaver*, 282 U. S. 765, involved an act of the State of Nebraska, guaranteeing bank deposits. This act required banks to pay semi-annually an assessment of 1/20 of one per cent of the average daily deposits to the guaranty fund to be used to make up deficiencies in the payment of claims of depositors against insolvent banks. The original act was passed in 1909. In 1923, it was amended so as to provide that whenever the

guaranty fund should fall below a prescribed minimum, an additional semi-annual assessment could .be levied. It appears that at the time the case arose banks in the State were failing rapidly and the guaranty fund was thereby greatly depleted. For four years prior to the time the suit was brought the maximum assessment was levied. The suit challenged the validity of the act on the ground that under the existing conditions it had become a tax on solvent banks to pay the debts of those that were insolvent. The court held that while the act, as originally passed in 1909, was a valid exercise of the police power, the 1923 amendment, under the existing economic conditions, was invalid. The act was treated as a police regulation enacted under the police power. It was said in the course of the opinion that a police regulation, although valid when made, may, by reason of events, become arbitrary and confiscatory in its operation. It will be noted that the change in conditions relied upon in that case was the increase in bank failures, and the later amendment to the act increasing the assessment. No statute or regulation dependent upon the exercise of the police power is here involved.

The case of *Nashville, Chattanooga and St. Louis Railway Co.* v. *Walters,* 294 U. S. 405, involved the validity of an act of the State of Tennessee which arbitrarily required railroads to pay one-half the cost of all grade separations. The act, though valid on its face, was held invalid when applied to the particular facts in that case. It was held that the enormous growth of the highway system of the State of Tennessee, and the policy of the Federal government to facilitate travel on Federal Aid State Highways, with the consequent increase in the number of necessary grade separations, had brought about a drastic change in the factual situation to which the statute was sought to be applied; that to arbitrarily require the railroads to pay one-half of the cost of such separations, without regard

to the facts in each particular case, and without requiring trucks, buses and other carriers to share a part of such expense, resulted in a confiscation of the property of the railroad company and a denial of due process, on the facts in that case.

The remaining case cited by appellants in this connection is *Chastleton Corp.* v. *Sinclair,* 264 U. S. 543. This is the only case cited in which the validity of a statute, or regulation, was involved in a situation brought about by a shifting of population. There an order of the Rent Commission of the District of Columbia was involved. It was pointed out that the order was passed under the authority of an emergency relating to housing facilities; that by reason of a change of population in the district, the emergency which was necessary to the exercise of the power had ceased to exist, whereby the order had become inoperative. The case was disposed of on the sole ground that there was no power to adopt or enforce the order, except to meet an existing emergency. The existence of the emergency was the source of the power. It was said in the opinion that a law depending on the existence of an emergency or other certain state of facts to uphold it, may cease to operate if the emergency ceases or the facts change, even though it was valid when passed. The power existed only in the emergency, and when the emergency ceased to exist the power likewise ceased.

No such question or situation is presented here. The power of the legislature to pass the 1901 Congressional Apportionment act did not depend upon the exercise of the police power, or the existence of an emergency or any other extraneous fact. The power was clearly vested and constitutionally exercised. This is conceded. It was not dependent upon the continuation of the population of the districts as such population existed at the time of the enactment. It could not be rendered invalid by changes in popu-

lation which might thereafter occur. The exercise of the power was not dependent upon an emergency nor conditioned upon the fact that the population of the districts would always remain relatively the same. The power of the legislature to enact the Congressional Apportionment act did not depend upon the accuracy of its prophecy as to what the population of the several districts would be forty years hence. The constitutionality of legislation does not depend upon a factor so vacillating and uncertain. To so hold would undermine and insidiously subvert all principles on which the power to legislate is based.

In view of the conclusions which we have reached on the question of the right of appellants to maintain the suit, it is unnecessary for us to consider the contention that the act in question violates the guaranty of freedom and equality in elections, found in section 18 of article 2 of the constitution of this State. With reference to the creation of congressional and senatorial districts and the formation of judicial circuits and districts, as well as wards in municipalities and other districts, the commands of section 18 of article 2 of the constitution are primarily addressed to the legislative branch of the government. Absolute equality cannot be attained. To argue that this section, in all cases, requires that such districts be equal in population so that every vote cast in one district would have the same effect as every vote cast in every other district, is to assert a millennium which cannot be reached.

This suit is, obviously, an attempt to ask the court to do indirectly what it cannot do directly,—*i.e.*, pass on a purely political question. (*Fergus* v. *McKinney, supra; People* v. *Blackwell, supra.*) It makes no difference that no relief is sought against the legislature directly as was done in the case of *Fergus* v. *Marks, supra,* where it was sought, by *mandamus,* to compel the legislature to pass a reapportionment act. A court of equity is prohibited from passing on any political question, and once it is determined

that the controversy involves political and not civil or property rights, the court must refuse to exercise its jurisdiction. (*Spies* v. *Byers, supra; Marshall* v. *Illinois State Reformatory*, 201 Ill. 9.) The power·to hold an election is political. A court of equity has no power to restrain officers in the exercise of that power. *Harris* v. *Schryock, supra.*

In support of their argument that this is not a suit to prevent the holding of an election, appellants assert that if a decree is rendered in their favor enjoining the expenditure of public funds for the payment of expenses incurred in holding a primary or an election in 1942, under the Congressional Apportionment act involved, it .does not mean that no such primary or election will be held. It is frankly conceded, and we agree with such concession, that even though the Congressional Apportionment act be held inoperative, under the applicable acts of Congress congressmen will be elected in the year 1942 from the State at large; that a primary and an election for that purpose will be called by the Governor and such primary and election, in all respects, will be held the same as under said Congressional Apportionment act, except that representatives to the lower house of Congress will be elected from the State at large instead of from the districts created by said act. It is also true that in the year 1942, a primary and a general election will be held throughout the State and in every precinct within the State, for the selection of candidates and the election of State officers. This primary and election will be held in the same precincts as the primary and election for the selection of candidates for and the election of congressmen from the State. In such primary and election, it is conceded that candidates for and members of Congress will be selected and elected whether they are chosen from districts or from the State at large. This argument, alone, demonstrates conclusively that no civil or property rights of appellants will be injured or

damaged by the holding of a primary and an election for members of Congress from the districts created by said Congressional Apportionment act, which by this suit they seek to indirectly prevent. In other words, the argument of appellants in support of their contention that the purpose of this suit is not to enjoin the holding of an election, and that no such result will be brought about by a decree favorable to them, completely answers their arguments on the other question in the case. It demonstrates that no civil or property rights of appellants will be adversely affected by the enforcement of the act. Following the arguments of appellants on this question further, we find that if a primary and an election are held in the year 1942 for the selection of candidates and the election of a congressman from each district created by said act, there will appear on the ballots in the primary the names of those who file a proper petition, under the primary law, for the office. In the election which follows there will be printed on the ballots the name of one candidate of each political party for the office of congressman from that district, and one from the State at large. If it should be determined that said act is invalid, then no primary or election would be held for the selection and election of members of Congress from the various districts. Instead of selecting candidates for and electing members of Congress from the districts created by said act, the total number of congressmen apportioned to the State, by the act of Congress, will be selected and elected in a State-wide primary and election. The result of this would be that in the primary, instead of having printed on the ballots the names of only the few who would be candidates from a particular district, the name of every candidate for Congress in the State would be printed on the ballots in every district and in every precinct. The same is true of the election. Under the present apportionment, Illinois is entitled to twenty-six congressmen. If they are elected by districts, then only

the names of those candidates from the particular district, selected by the various political parties, would appear on the ballots in the general election in that district. On the other hand, if they are to be elected from the State at large, then in every district throughout the State, the ballots would have to contain the names of twenty-six candidates of each political party for the office of representative in Congress. The result would be that in every district and in every voting precinct the names of probably one hundred, or more, candidates for Congress would necessarily appear on the ballots. If such election is held in the districts created by said act, then there would only appear on the ballots in each district the name of one congressman selected as a candidate from the district by each political party, and one from the State at large. In this situation it does not require the genius of either a Plato or an Aristotle to foresee that a primary for the selection of candidates, or an election for members of Congress, from the State at large, would result in more expense in the printing of ballots, sample ballots and other election supplies. This would greatly increase the quantity of election supplies necessary because of the larger number of candidates for whom votes would be cast in each precinct throughout the State. Yet, appellants raise no objection to the use of tax money for the purpose of paying the expenses of a primary or an election for the selection of the entire State delegation in Congress from the State at large. They not only admit, as they must, but they insist that if the 1901 Congressional Apportionment act is held invalid, congressmen may be lawfully elected from the State at large. Obviously, by that method of election, the expenses incurred and the use of public funds in which appellants here have a remote and inconspicuous interest, would be greatly increased.

For the purpose of further illustration it may be assumed that we have two major political parties in this State. Upon such assumption, if congressmen are elected from

the districts created by said act, there will be printed on the ballots, in each district, the names of only two candidates for Congress from the district, and one from the State at large, nominated by each political party. If congressmen are elected from the State at large in the same situation, the names of at least fifty-two candidates will appear on the ballots in every precinct throughout the State. Not only would this materially increase the cost of procuring and printing ballots but a like increase of expense would be incurred in the preparation and printing of tally sheets, certificates and other necessary election supplies. The time necessary to count and tabulate the votes by judges of elections and local canvassing boards, as well as by the State canvassing board, would be correspondingly increased. It is not beyond the purview of actual knowledge to assume that the cost of a primary and the cost of an election, to be paid by public expense, would be at least doubled, if congressmen are nominated and elected from the State at large.

It follows that upon the argument of appellants, alone, their rights would be better protected and the saving of public funds increased, by denying to appellants the right to maintain this suit. The relief which appellants ask, therefore, instead of being a benefit to them and conserving their property rights in the public funds, would be a positive detriment to them. It is beyond the scope of equity jurisdiction to assist a litigant in dissipating, rather than protecting his property rights. Courts of equity may only enforce rights. They cannot either foster or nurture inequities, even at the suit of those who will be adversely affected by the decree which they ask the court to enter.

This conclusion is not in conflict with the case of *Fergus* v. *Russel*, 270 Ill. 304, as to the right of taxpayers to maintain a suit of this character. In that case it was alleged by the taxpayer, *inter alia*, that the Governor had attempted to

veto, in part, certain items contained in the Omnibus Appropriation Bill, by reducing the amounts appropriated. The validity of these items was attacked by the complainant on the ground that the effect of the attempt of the Governor to reduce the items and approve the same for the reduced amounts, as set forth in his veto message, rendered the entire items invalid. It was held, however, that the Governor could only approve or disapprove an item as a whole; that what he did in that particular case was to merely express his disapproval of a portion of each of the various items but approved the remainder of such items. It was held that the action of the Governor, in attempting to veto only, in part, the various items indicated in the veto message, was without any effect whatever; that those items remained valid enactments just as though the Governor had expressly approved them or had allowed them to become a law without his approval. That case is not authority for the contention that a taxpayer may maintain a suit to enjoin the use of public funds in a case in which the decree requested by him will result in increasing the tax burdens and thereby injuriously affect his rights. It was not the purpose of the suit in that case to have the court hold valid the entire items attempted to be vetoed in part. The prayer of the taxpayer was that said items be held invalid *in toto* because of the futile and ineffectual attempt of the Governor to veto such items, only in part. The fact that as a result of the suit the items of appropriation held valid were greater than the complainant alleged they should be, is quite different from holding that a taxpayer may maintain a suit upon the theory that his civil and property rights will be injuriously affected by the expenditure of public funds, in which suit the only result of the decree which he asks would be to increase the public expenditures. There is nothing in that case which can be used by appellants to extricate them from the position in

which they have placed themselves by the facts alleged in the complaint.

It is argued by appellants that every citizen and taxpayer is expressly given the right to maintain a suit to enjoin the illegal disbursement of public funds by section 1 of the act in relation to suits of that character. (Ill. Rev. State. 1941, chap. 102, par. 11.) It was not the purpose of that act to enlarge but only to limit and restrict such right. By section 4 of the act it is provided that a taxpayer may only institute a suit for that purpose upon special leave granted by the court. (Ill. Rev. Stat. 1941, chap. 102, par. 14.) By the same section it is provided that upon a hearing of the petition of the taxpayer for leave to file the suit, "if the court or the judge thereof shall be satisfied that there is reasonable ground for the filing of such suit in equity, the court or judge may grant the petition and order the complaint to be filed and process to issue." It is, therefore, clear that it was not the intention of said act to enlarge the right of citizens and taxpayers nor to extend the jurisdiction of courts of equity. On the contrary, its only purpose was to limit that right and to prevent a citizen and taxpayer from instituting suits of that character, in addition to the limits already placed upon them by the equitable jurisdiction of the courts. There is nothing in the act to indicate an intention to enlarge or extend the established jurisdiction of courts of equity or to extend such jurisdiction to the determination of political questions.

It is our conclusion that appellants, by their petition and complaint, made no sufficient showing to entitle them to file the complaint or maintain the suit. The order of the circuit court of Madison county denying the prayer of the petition was right, and that order and judgment is affirmed. *Judgment affirmed.*