(No. 48694.-)

ROBERT H. SNOW, Appellee, v. ALAN J. DIXON, State Treasurer, *et al.*—(Alan J. Dixon, State Treasurer, *et al.*, Appellants; Marvin E. Schatzman *et al.*, Appellees.)

*Opinion filed April 5, 1977.—Rehearing denied May 27, 1977.*

CLARK and DOOLEY, JJ., took no part.

William J. Scott, Attorney General, of Chicago (Herbert Lee Caplan and Gerald T. Rohrer, Assistant Attorneys General, of counsel), for appellants Alan J. Dixon *et al.*

Barnet Hodes, J. Herzl Segal, Malcolm S. Kamin, and Pamela Baker, of Arvey, Hodes, Costello & Burman, of Chicago, for appellant Illinois Central Gulf Railroad Co.

Harry A. Young, Jr., and Ronald G. Silbert, of Neistein, Richman, Hauslinger & Young, Ltd., of Chicago, for appellee Robert H. Snow.

Gerald W. Shea, of Berwyn, for appellee Marvin E. Schatzman.

Bernard Carey, State's Attorney, of Chicago (Paul P. Biebel, Jr., Deputy State's Attorney, and Dorothy Kirie Kinnaird, Assistant State's Attorney, of counsel), for appellees County of Cook *et al.*

MR. JUSTICE MORAN delivered the opinion of the court:

In 1851, by "An Act to incorporate the Illinois Central Railroad company" (1851 Private Laws of Illinois 61, hereinafter, the charter), the Illinois General Assembly authorized construction of a railroad line between Chicago and Cairo with a branch to the Mississippi River via Galena, and granted for that purpose a 200-foot right-of-way and approximately 2.6 million additional acres along that right-of-way. Most of this land derived from Federal land grants of the prior year. The line constructed pursuant to this charter (the charter line) includes 705.5 miles of main line. This, in addition to 1,820 miles of non-charter-line track, was operated by the Illinois Central (IC) until August 10, 1972, when, pursuant to a plan of reorganization (Plan) approved by the Interstate Commerce Commission (Commission), the IC sold and conveyed all of its assets to the defendant, Illinois Central Gulf Railroad Company (Gulf), a newly formed Delaware corporation, in exchange for stock. The IC distributed this stock to its shareholders and purportedly dissolved. Gulf has since owned and operated the IC's former charter line and the noncharter lines, as well as the former Gulf, Mobile & Ohio Railroad lines. In the same manner as the IC before it, Gulf has paid the 7% gross revenue tax imposed on IC's charter line. This tax, under sections 18

and 22 of the charter (which may be found, as modified, in Ill. Rev. Stat. 1975, ch. 120, pars. 373, 374), was imposed on IC in lieu of ordinary taxes. Gulf, likewise, has paid it in lieu of other taxes, and it has been thus accepted for the years 1972 through 1975 without challenge by the defendant State of Illinois officials (State).

The instant dispute arises from the claim of Robert H. Snow, an Illinois taxpayer, that State funds are being disbursed to effect the collection from Gulf of the illegal 7% tax on charter properties. He brings this action under "An Act in relation to suits to restrain and enjoin the disbursement of public moneys by officers of the state" (Ill. Rev. Stat. 1975, ch. 102, par. 11 *et seq.*) (the Public Monies Act). The essence of the action is that this 7% tax was an exemption personal to IC, not applicable to Gulf, and is being illegally collected in lieu of other taxes which would ordinarily be due from the charter line. Marvin E. Schatzman (as a Cook County taxpayer), Edward J. Rosewell (as Cook County treasurer), and Stanley T. Kusper, Jr. (as Cook County clerk), intervened. On cross motions, the circuit court rendered summary judgment for the plaintiff on May 17, 1976, finding that under the plan of reorganization the tax on the charter line did not become an obligation of Gulf, and Gulf did not acquire IC's special tax exemption. The chancellor decreed IC dissolved, enjoined the State from continuing to collect the charter tax from Gulf and from expending public funds in connection therewith, and ordered the Director of the Department of Local Government Affairs, effective August 10, 1972, to "assess the Charter Property in the same manner as he assesses the property of other railroads in the State" and to "transmit the lists and information to the various proper taxing authorities of the Illinois counties in which Charter Property is located."

On appeal, Gulf urges that the charter property tax obligation and corresponding immunity from other tax were contract rights passed to Gulf by virtue of the

Commission's approval of its plan of reorganization. Gulf further urges that, should this court disagree with this proposition, the trial court's order requiring Gulf's charter line to be assessed in the same manner as other Illinois railroads should be applied prospectively only.

The State agrees with Gulf that the 7% charter tax is due and owing, but contends it is due from IC; that the contract rights created in the charter between IC and the State may not be unilaterally abrogated by the IC or by the powers of the Commission to approve the Plan. Additionally, the State asserts that Snow lacks standing to attack the voluntary payment of a tax by another, and that administrative review, rather than suit under the Public Monies Act, is the proper vehicle for this action.

With reference to the question of standing and appropriateness of this action under the Public Monies Act, the State asserts that the amounts collected by the 7% tax total over $5.6 million per year, whereas the $41,400 expended in auditor's salary for its collection are *de minimis,* and that therefore Snow and the other taxpayers he represents have no interest in preventing the token expenditure. The State ignores the fact evidenced by the record that the time of literally hundreds of State employees is devoted in some part to the assessment and collection of this tax. Furthermore, there is no require-ment that a taxpayer's individual interest in a suit under the Public Monies Act be substantial. In the case of *Krebs v. Thompson* (1944), 387 Ill. 471, 475-76, the court acknowledged that, "[u]nder the settled rule in this State, every taxpayer is injured by the misapplication of public funds, whether the amount be great or small. Such injury is not prevented by the fact that the State may thereafter receive fees under an unconstitutional statute in excess of the cost of its administration." Long before the enactment of the Public Monies Act, the citizens and taxpayers of this State have been permitted to sue to enjoin the misuse of public funds. (See *Barco Manufacturing Co. v. Wright*

(1956), 10 Ill. 2d 157, 160, and *Fergus v. Russel* (1915), 270 Ill. 304, 314, and cases cited therein. See also *Cusack v. Howlett* (1969), 44 Ill. 2d 233, 236.) Furthermore, a taxpayer may bring suit to enjoin the misuse of public funds in administering an illegal legislative act even though the taxpayer is not subject to the provisions of that act. (*Mansfield v. Carpentier* (1955), 6 Ill. 2d 455, 460-61; *Bode v. Barrett* (1952), 412 Ill. 204, 233-34; *Krebs v. Thompson* (1944), 387 Ill. 471, 474.) The case of *Droste v. Kerner* (1966), 34 Ill. 2d 495, cited by the State for the proposition that the taxpayers have no standing to sue because the public funds allegedly disbursed illegally were *de minimis,* was a consolidated appeal from two actions: one attacking a legislative enactment conveying State lands brought under the Public Monies Act; another attacking the same enactment on a theory of public trust. The court found that the Public Monies Act did not give the plaintiffs standing to maintain the first action, for conveyance of public lands was not the improper "disbursement" of public "funds" contemplated by the Act. In the second action, under the public trust doctrine, the plaintiff alleged that certain State funds would be expended for land surveys, title reports and the like to carry out the protested act. The court viewed these allegations as "no more than speculative conclusions" and then determined that "in any event, the expenditures which plaintiff alleges are *de minimis* for purposes of standing to sue as a taxpayer." (*Droste v. Kerner* (1966), 34 Ill. 2d 495, 505.) The court's statement regarding *de minimis* expenditures specifically referred to standing to sue under the public trust doctrine rather than under the Public Monies Act. Furthermore, this aspect of *Droste* was overruled in *Paepcke v. Public Building Com.* (1970), 46 Ill. 2d 330, 341. *Droste* is clearly irrelevant to the issue of standing in the case at hand. Other cases which the State cites to demonstrate that the Public Monies Act is an inappropriate vehicle for this suit are not on point. *Daly v. County of*

*Madison* (1941), 378 Ill. 357, 361, brought by taxpayers to enjoin an election, was characterized by the court as an action involving a political question which the courts of equity have no power to resolve. The case of *People ex rel. Morse v. Chambliss* (1948), 399 Ill. 151, was not brought under the Public Monies Act. The plaintiff taxpayer there sued the property owner to enforce a tax lien of about $13,500 against defendant's property, which lien he claimed to have arisen as a result of taxing officials' unauthorized acceptance of $14,500 as full satisfaction for back taxes of $28,000. The court in *Chambliss* observed that "[t]here can be no question but that the suit is for the collection of taxes alleged to be due and owing" (399 Ill. 151, 153), that the taxing body must direct the bringing of such suit, and that an individual taxpayer has no right to bring suit for the collection of taxes. The case *sub judice* is clearly distinguishable. It is designed to prevent the continued acceptance of an allegedly unlawful tax in lieu of all other taxes, when the appropriate taxing authorities have declined, and still decline, to follow applicable statutory procedures requiring them to assess all of Gulf's property in the same manner as other railroad properties assessed.

The State asserts that administrative review is the appropriate method for determining the correctness of a tax, and that the Public Monies Act is an inappropriate vehicle because it was not intended to enlarge the rights of citizens or extend the established jurisdiction of a court of equity. (*Daly v. County of Madison* (1941), 378 Ill. 357, 376.) *Owens-Illinois Glass Co. v. McKibbin* (1943), 385 Ill. 245, 256-57, reviewed the decisions of this court regarding injunctive relief in tax matters and acknowledged the firmly established principle that "equity has jurisdiction to enjoin the collection of an unauthorized tax, although there exists a concurrent remedy at law." This principle continues to be viable (see *Sta-Ru Corp. v. Mahin* (1976), 64 Ill. 2d 330, 334; *Illinois Bell Telephone Co. v. Allphin*

(1975), 60 Ill. 2d 350, 359-61) despite a modification to that rule created in *Illinois Bell*. In *Illinois Bell* (60 Ill. 2d 350, 359), this court held that the above proposition from *Owens* was no longer applicable where an administrative remedy was available under the Administrative Review Act. The State, for the first time on appeal, asserts that prior to bringing this suit the plaintiffs failed to invoke correct administrative remedies (presumably administrative review of defendant Kirk's assessment, or lack thereof, on the charter property). Since this argument was presented for the first time on appeal, it is deemed waived, and the rule of *Illinois Bell* is thus inapplicable. We conclude that this action is one traditionally entertained by courts of equity. We do not, therefore, address the applicability of the *Owens* rule in an action seeking an injunction under the Public Monies Act where administrative remedies are allegedly available. For the reasons above, we hold that plaintiff had standing and may properly maintain this action under the Public Monies Act.

It is the position of both Gulf and the State that the imposition of the charter tax in the years 1972 to 1975 was lawful, but their rationales differ. Gulf claims that all of IC's rights and obligations, including the charter tax and exemption from other taxes, were transferred to Gulf under the "plenary power" of the Commission to effectuate such transfer. The State argues that the charter constitutes a contract between IC and the State; that it was beyond the power of the Commission, by approving the plan of reorganization, to transfer the charter properties, rights, and obligations to Gulf in abrogation of the charter contract; and that, therefore, IC has not been dissolved and the charter tax is still due and owing from it.

Plaintiff Snow maintains that the tax rights and obligations derived under the charter were personal to IC and were nontransferable without the consent of the Illinois General Assembly; that the language of the charter itself anticipates and authorizes the sale of the IC charter

property; that the charter itself expressly cuts off the right to IC's tax exemptions when the charter property is sold to third persons; that the Commission's approval of the Plan did not purport to transfer IC's charter tax rights and immunities to Gulf; that the Commission's power extends to all acts necessary to effectuate the Plan (including the sale of all IC assets to Gulf) but its power does not extend to matters of taxation exclusively reserved to the States; and that the effect of the approved sale of all IC's property to Gulf was the dissolution of IC by operation of law.

The history of IC's organization is well recorded in the judicial opinions of this State. Most of the land was provided to the IC by land grant. from the Federal government through the State.

> "The Congress of the United States *** in 1850 passed an act granting to the State of Illinois a right of way through the public lands and the ownership of every alternate section of land for more than six miles in width on each side thereof, to aid the State in constructing the railroad finally built by [IC]." (*People v. Illinois Central R.R. Co.* (1916), 273 Ill. 220, 234.)

> "The act provided that the lands granted should be subject to the disposal of the legislature of Illinois and be applied to the construction of the said road and branches, and to no other purpose. *** By section 15 of the charter appellee was granted all the lands ceded to the State by the act of Congress of 1850; also depot grounds in the city of Cairo, the right of way and all the improvements made thereon by the Internal Improvement Commission and the Great Western Railway Company under the acts of 1837. This latter property was in addition to that ceded to the State by the act of Congress of 1850." (*State v. Illinois Central R.R. Co.* (1910), 246 Ill. 188, 197-98.)

"When this charter was granted, the privilege or franchise to build this railroad was not considered of any special value. In the fifteen years, more or less, previous to the granting of this charter the public authorities had made several attempts to build a railroad similar to the one that was finally constructed by appellant company, and in one act the State had appropriated three and a half million dollars for that purpose. \*\*\* The year this charter was granted, Gov. French, then chief executive of the State, said: 'The constitution having wisely debarred the State from again involving its credit in wild and visionary schemes of internal improvement, their chance of success rests upon individual skill, capital and enterprise.' " *People v. Illinois Central R.R. Co.* (1916), 273 Ill. 220, 234-35.

The land then granted to IC by the charter was largely "undeveloped and its ultimate value entirely problematical." *People v. Illinois Central R.R. Co.* (1916), 273 Ill. 220, 235.

"In passing the Land Grant act, granting to the State the alternate sections of land afterward received by appellant company from the State, Senator Stephen A. Douglas in the United States senate said: '\*\*\* These lands have been in the market from fifteen to thirty years. The average time is about twenty-three years. But they will not sell at the usual price of $1.25 per acre because they are distant from any navigable stream or a market for produce. \*\*\*' " *People v. Illinois Central R.R. Co.* (1916), 273 Ill. 220, 234.

Likewise, the contractual nature of the charter and the 7% charter tax imposed on IC therein are firmly established. (*State v. Illinois Central R.R. Co.* (1910), 246 Ill. 188, 205-07, and cases cited therein.) Sections 18 and

22 of the charter, authorizing the charter tax, are set out in full in *People v. Illinois Central R.R. Co.* (1916), 273 Ill. 220, 224-25. Section 22 provided:

> "Sec. 22. The lands selected under said act of congress, and hereby authorized to be conveyed, *shall be exempt from all taxation under the laws of this state, until sold and conveyed* by said corporation or trustees, and the other stock, property and effects of said company shall be in like manner exempt from taxation for the term of six years from the passage of this act." (Emphasis added.) 1851 Private Laws of Illinois 72.

Plaintiff Snow asserts that the above section of the charter contemplates the sale of the charter line and that the tax exemptions indicated therein are effective only until the property is sold and conveyed. He also asserts the transaction between IC and Gulf constituted such sale and conveyance of IC properties, which sale to Gulf cut off the tax exemption and did not effect a transfer to Gulf of the right and obligation to pay the charter tax in lieu of other taxes. The State, on the other hand, asserts that the above charter section contemplated only the sale of non-right-of-way properties to raise funds from time to time. Such properties would lose their tax-exempt status upon transfer to a third party. This section does not, it is asserted, speak to the sale of the railroad as an entity and, consequently, does not speak to the question of charter rights and obligations in the hands of a purchaser of the railroad as an entity. Both the State and Gulf urge, in this regard, that the intent of the charter may be gleaned by referring to the subsequent actions of the legislature in 1885 (Ill. Rev. Stat. 1975, ch. 114, par. 165), and in 1933 (Ill. Rev. Stat. 1975, ch. 32, par. 157.160). The former act provides, in terms virtually identical to those used in the latter, that nothing in the act "shall be so construed as to authorize or permit the Illinois Central Railroad Company to sell the railway constructed under its charter, *** except subject to the rights of the state under its contract with said company, *** under the provisions of said

charter." The State urges that the intent to disallow unilateral abbrogation of the charter terms is evident in these enactments. Gulf, on the other hand, argues that these enactments support its proposition that the charter permitted the sale of the IC charter property, subject only to the buyers assuming the IC's obligations to the State under the charter.

The circuit court concluded (as was suggested by Snow) that section 22 of the charter contemplated a sale or conveyance of the railroad as an entity. This interpretation is erroneous. The cited portion of section 22 refers to two broad classes of properties: those *"lands* *** hereby authorized to be conveyed,"* and the *"other stock, property,* and *effects* of said company." (Emphasis added.) We believe the phrase "lands *** hereby authorized to be conveyed" necessarily refers to the land adjacent to and along the railroad right-of-way, the sale of which was specifically provided for by section 16 of the charter. (1851 Private Laws of Illinois 70.) That the sale of less than all of the railroad property was authorized by the charter terms is implicit in the use in section 22 of the specific term "lands" rather than the more general term "properties." Furthermore, immediately after the reference to "lands *** authorized to be conveyed," the charter deals with *"other* stock, property, and effects ***." (Emphasis added.) Although we are unable to conclude that these provisions authorize the sale of the railroad as an entity, we are likewise unable to infer from these and other charter terms that the IC was forbidden to make such a sale. No language in the charter may be fairly interpreted to prohibit such sale, and we decline the State's invitation to construe the acts of the legislature, 34 years or more after the charter's acceptance by IC and enactment by the General Assembly, to imply such a term in the contract between IC and the State.

The State nevertheless asserts that, where a corporation such as a railroad has been granted a charter franchise

intended to be exercised "for the public good, the due performance of those functions being the consideration of the public grant, any contract which disables the corporation from performing those functions which undertakes, without the consent of the State, to transfer to others the rights and powers conferred by the charter, and to relieve the grantees of the burden which it imposes, is a violation of the contract with the State, and is void as against public policy." (*Thomas v. West Jersey R.R. Co.* (1879), 101 U.S. 71, 83, 25 L. Ed. 950, 952.) By this and like citations, the State asserts that the unilateral acts of the IC, purporting to transfer all its assets, rights and obligations to Gulf without State consent, constitutes a forfeiture and reversion of the railroad. It is also suggested, inferentially, that the State has a contractual interest, implied by law and because of public policy, in the continued existence of the charter, maintenance of the charter line by IC, and the right to collect the 7% charter tax from IC. We take no issue with the holding in *Thomas,* but we believe its effect is overridden to the extent necessary to effect a transaction approved by the Commission under 49 U.S.C. sec. 5 (1970). Section 5(11) provides:

> "[A]ny carrier *** participating in *** any transaction approved by the Commission [under section 5] *** shall have full power *** to carry such transaction into effect and to own and operate any properties and exercise any control or franchises acquired through said transaction without invoking any approval under State authority; and any carriers *** participating in a transaction approved or authorized under the provisions of this section shall be and they are relieved from the operation of *** prohibitions of law, Federal, State or municipal, insofar as may be necessary to enable them to carry into effect the transaction so approved or provided for ***, and to hold, maintain, and operate any properties and exercise any control or franchises acquired through such transaction. ***"

The power of the Commission to approve transactions under section 5 in derogation of State law, of course,

ultimately derives from the powers of Congress under the supremacy clause of the United States Constitution (U.S. Const., art. VI), which provides that a constitutional act of Congress shall be the supreme law of the land, the laws of any State to the contrary notwithstanding, and from the interstate commerce clause (U.S. Const., art. I, sec. 8), which empowers Congress to regulate commerce among the several States. It has been long recognized, however, that congressional power to occupy a field of law is not necessarily coextensive with its exercise of that power. *Willson v. Black Bird Creek Marsh Co.* (1829), 27 U.S. (2 Pet.) 245, 7 L. Ed. 412; *Cooley v. Board of Wardens* (1851), 53 U.S. (12 How.) 299, 13 L. Ed. 996.

It is, of course, clear that an agency of Congress has authority to act only within the scope of powers delegated to it by statute. Relevant to an understanding of the scope of the authority given the Commission under 49 U.S.C. sec. 5 is the brief history provided by the Supreme Court of the development and regulation of our nationwide system of railroads:

"The basic railroad facilities of the United States were constructed under state authorization and restrictions by corporations whose powers and limitations were prescribed by state legislatures, or resulted from limitations on the states themselves. Construction in reference primarily to local or regional transportation needs created duplicating and competing facilities in some areas and provided inadequate ones in others. Expansion necessary to serve advancing national frontiers was stimulated by extensive subsidies from the Federal Government, largely in the form of land grants. But the stress and strain of World War I brought home to us that the railroads of the country did not function as a really national system of transportation. That crisis also made plain the confusions, inefficiencies, inadequacies

and dangers to our national defense and economy flowing from the patchwork railroad pattern that local interests under local law had created.

The demand for an integrated, efficient and coordinated system of rail transport, equal to the needs of our national economy and defense, resulted in the Transportation Act of 1920. In a series of decisions on particular problems, this Court defined the general purposes of that Act \*\*\*. The tenor of all of these was to confirm the power and duty of the Interstate Commerce Commission, regardless of state law, to control rate and capital structures, physical make-up and relations between carriers, in the light of the public interest in an efficient national transportation system. [Citations.]

As a means to this end, the 1920 Act required the Commission to prepare and adopt. a plan for nationwide consolidations of the railway properties of the country. \*\*\*
 \*\*\*

The Transportation Act of 1940 relieved the Commission of formulating a nationwide plan of consolidations. Instead, it authorized approval by the Commission of carrier-initiated, voluntary plans of merger or consolidation if, subject to such terms, conditions and modifications as the Commission might prescribe, the proposed trans-actions met with certain tests of public interest, justice and reasonableness, in which case they should become effective regardless of state au-thority. \*\*\* This Court has recently and unani-mously said in reference to this Act, 'Congress has long made the maintenance and development of an economical and efficient railroad system a matter of primary national concern. Its legislation must be read with this purpose in mind.' *Sea-*

board *Air Line R. Co. v. Daniel,* 333 U.S. 118."
*Schwabacher v. United States* (1948), 334 U.S.
182, 191-93, 92 L. Ed. 1305, 68 S. Ct. 958,
963-64.

The Commission's approval of a section 5 transaction
is dependent upon, among other considerations, a finding
that such transaction will be "consistent with the public
interest." (*Schwabacher v. United States* (1948), 334 U.S.
182, 194, 92 L. Ed. 1305, 1313, 68 S. Ct. 958, 965.) In its
opinion approving the subject transaction, the Commission
pointed out at page 841:

> "The phrase 'consistent with the public
> interest,' as judicially construed, means compat-
> ible with, or not contradictory or hostile to the
> public interest. See *Pacific Power and Light Co. v.
> Federal Power Comm.,* 111 F. (2d) 1014, 1016.
> As was stated by the Supreme Court in *New York
> Central Securities Corp. v. United States,* 287
> U.S. 12, 25:
>
> 'The term "public interest" *** has a direct relation to
> the adequacy of our transportation system, to its essential
> conditions of economy and efficiency and to appropriate
> provision and best use of transportation facilities.' "
> (Illinois Central Gulf R.R. Co.—Acquisition—Gulf, Mobile
> & Ohio R.R. Co., Illinois Central R.R. Co. *et al.* (1971),
> 338 I.C.C. 805, 841.)

The Commission, further, made a specific finding that the
transaction was in the best interest of the public. (338
I.C.C. 805, 834.) We therefore believe that public policy
was adequately served by the Commission's necessary
finding that the transaction was in the public interest.
Insofar as necessary to effect a section 5 transaction,
section 5(11) suspends any charter term, express or
implied, which would otherwise prevent the sale of IC. As
the sale of all IC assets, including the substantial charter
line properties, was the very foundation of the transaction
approved by the Commission, such sale was clearly
encompassed within the section 5(11) protection from

inhibiting State laws. *Seaboard Air Line R.R. Co. v. Daniel* (1948), 333 U.S. 118, 92 L. Ed. 580, 68 S. Ct. 426.

It has been observed that "[t]he law does not expressly dissolve the selling corporation, but it leaves it without stock, officers, property, or franchises. A corporation without shareholders, without officers to manage its business, without property with which to do business, and without the right lawfully to do business, is dissolved by the operation of the law which brings this condition into existence." (*Rochester R. Co. v. Rochester* (1907), 205 U.S. 236, 256, 51 L. Ed. 784, 792, 27 S. Ct. 469.) The State, nevertheless, further objects that the chancellor incorrectly ruled on the issue of IC's dissolution because that issue has never been presented to the court on proper pleadings where the parties are correctly aligned. (We point out in this regard that the State, though given notice and invitation to attend the Commission hearings on the subject plan of reorganization, declined to attend.) The circuit court afforded the State the opportunity to plead this issue and provided a 30-day continuance expressly for that purpose. The State did not so plead. We therefore hold that, under all these circumstances, the circuit court correctly ruled that the IC was dissolved.

Snow urges that, although approval of the Plan was sufficient to effect a sale of the IC properties to Gulf, such approval did not confer upon Gulf the IC's charter tax status. He maintains that these tax exemptions and obligations did not survive the sale and conveyance of the charter line properties to Gulf. Snow's argument is three-pronged. First, section 22 provides that the tax-exempt status of the charter property existed only until the charter property was sold and conveyed. Second, he argues that the so-called Charter Immunity Cases (cited later) establish that tax exemptions created as to one corporation are personal to that corporation and are not part of the general franchises which may be transferred upon sale to another corporation. Instead, the new

corporation becomes subject to the general tax laws existing at the time of its formation. Third, Snow poses that the Commission's approval did not have the effect of overriding the nontransferability of tax exemptions under State law because such override was not necessary to effect the section 5 transaction, and because the Commission did not purport to address the State taxation issue.

Snow's first argument fails because section 22 of the charter, as discussed above, cuts off the tax exemption of charter properties "hereby authorized to be conveyed." Section 22 does not deal with the sale of the charter line as an entity, or with the transfer or loss of the special tax status incident thereto. No other charter provision deals with the tax status of the charter properties in the hands of a third party. However, in the absence of a specific charter provision or a valid act of the General Assembly expressly providing therefor, we hold that the tax exemption and charter tax granted IC were personal to IC and could not pass on sale to Gulf. The body of law evolved in the 10 so-called Charter Immunity Cases amply supports this conclusion. *Yazoo & Mississippi Valley R.R. Co. v. City of Vicksburg* (1908), 209 U.S. 358, 52 L. Ed. 833, 28 S. Ct. 510; *Rochester Ry. Co. v. City of Rochester* (1907), 205 U.S. 236, 51 L. Ed. 784, 27 S. Ct. 469; *Yazoo & Mississippi Valley R.R. Co. v. Adams* (1901), 180 U.S. 1, 45 L. Ed. 395, 21 S. Ct. 240; *Chesapeake & Ohio Ry. Co. v. Miller* (1885), 114 U.S. 176, 29 L. Ed. 121, 5 S. Ct. 813; *St. Louis, Iron Mountain & Southern Ry. Co. v. Berry* (1885), 113 U.S. 465, 28 L. Ed. 1055, 5 S. Ct. 529; *Memphis & Little Rock R.R. Co. v. Berry* (1884), 112 U.S. 609, 28 L. Ed. 837, 5 S. Ct. 299; *Louisville & Nashville R.R. Co. v. Palmes* (1883), 109 U.S. 244, 27 L. Ed. 922, 3 S. Ct. 193; *Wilson v. Gaines* (1881), 103 U.S. 417, 26 L. Ed. 401; *Atlantic & Gulf R.R. Co. v. Georgia* (1879), 98 U.S. 359, 25 L. Ed. 185; *Morgan v. Louisiana* (1876), 93 U.S. 217, 23 L. Ed. 860. See *Cincinnati, Indianapolis & Western R.R. Co. v. Barrett* (1950), 406 Ill. 499, 504-05.

Did the Commission's approval of the sale of the IC's property to Gulf effect a transfer to Gulf of IC's charter tax status which otherwise ended under the Charter Immunity Cases? It is Gulf's thesis that the Commission's approval of a plan of reorganization operates, under section 5(11), to suspend the effect of State tax law. Gulf's reading of section 5(11) emphasizes reference to the "plenary powers" of the Commission, but Gulf ignores the effect of the express limitation of that section to suspensions of State law only "insofar as may be necessary to enable them to carry into effect the transaction so approved ***." 49 U.S.C. sec. 5(11) (1970).

As discussed above, Congress' power to fully occupy a field of law is not necessarily coextensive with the exercise of that power. On the other hand, matters of State taxation are reserved to the States under the tenth amendment to the Constitution. (See *Thomson v. Union Pacific R.R. Co.* (1870), 76 (9 Wall.) U.S. 579, 591, 19 L. Ed. 792.) The power of the State legislature to levy and collect taxes is unrestricted where such tax is not otherwise unconstitutional. (*People ex rel. Schuler v. Chapman* (1939), 370 Ill. 430, 437; see also *State v. Illinois Central R.R. Co.* (1910), 246 Ill. 188, 206.) When the United States Constitution has granted the Federal government plenary jurisdiction in a certain field, and an act of Congress within that field impinges upon an area traditionally reserved to the States (taxation, in this instance), a rule of construction has grown up to shelter this delicate area of State's rights. This rule affirms that "Congress may circumscribe its regulation and occupy a limited field" and prescribes that "the intention to supersede the exercise by the state of its authority as to matters not covered by the Federal legislation is not to be implied unless the act of Congress fairly interpreted is in conflict with the law of the state." *Atchison, Topeka & Santa Fe Ry. Co. v. Railroad Com.* (1930), 283 U.S. 380, 392-93, 75 L. Ed. 1128, 1137, 51 S. Ct. 553, 556.

Section 5(11) of the Act reveals congressional intention to abrogate State law in section 5 transactions no further than necessary to effect that transaction. It is our opinion that a fair reading of that act does not reveal a congressional intent to supersede State law in the matter of State taxation, where the otherwise applicable State tax imposes no unconstitutional burden upon interstate commerce. As the authority of an agency of Congress extends no further than the act conferring that authority, it is our opinion that the Commission's approval of the Plan did not operate to extend the otherwise invalid charter tax and concurrent exemptions to Gulf.

This conclusion is further based on the fact that the Commission did not address, much less attempt to adjudicate, the question of such charter tax exemptions in its detailed, 76-page opinion approving the transfer. The Plan itself nowhere makes any explicit reference to the charter tax obligations of IC or of their transfer to Gulf. Only in exhibit C to the Plan, entitled "Indenture Sale, Assignment and Transfer," is any reference whatsoever made to IC's charter tax obligations. Paragraph 3(e) thereto provides that Gulf "assumes all contracts, obligations or liabilities *** and agrees that any lien of the State *** upon, or right to tax, the charter line property *** in accordance with the provisions of the charter ***, approved February 10, 1851, shall not be released, suspended, modified, altered, remitted or in any manner diminished or impaired as against [Gulf] but the same, as applicable to the charter line property *** shall be and remain *** binding upon [Gulf]." This provision appears to reflect IC's desire and Gulf's assent that IC be held harmless by Gulf for any charter taxes thereafter imposed upon IC by the State. Further, no express reference to the charter tax exemptions is made anywhere in the Plan, the exhibits, or the opinion of the Commission.

Fairly considered, the Commission's approval of the plan of reorganization, which plan contained no reference

to IC's special tax exemption and referred to IC's tax status only obliquely in an exhibit thereto, cannot be deemed to authorize the transfer to Gulf of IC's charter tax obligations or immunities, in the absence of some express reference to the contrary in the Commission's opinion. No such reference here exists. We hold that IC's special tax obligation and immunities did not pass to Gulf under the terms of IC's charter, or by enabling legislation, or by virtue of the Commission's approval of the reorganization. It follows that the taxes generally applicable to railroads in this State were applicable to Gulf commencing August 10, 1972.

It remains for this court to determine whether these generally applicable State taxes can and should be applied retroactively upon Gulf. Gulf maintains that the taxes may be assessed and collected only pursuant to statute, and that there is no statutory scheme which permits such retroactive application; that reassessment may be accomplished only by way of administrative review prior to finalization of the assessments, and once these have been certified to the county clerk by the Department of Local Government Affairs there can be no reassessment. The tax action which the chancellor ordered the Department of Local Government Affairs to take herein is erroneously characterized by Gulf as a "reassessment." Such characterization is based upon the following: section 80 of the Revenue Act of 1939 (Ill. Rev. Stat. 1975, ch. 120, par. 561) provides that all real estate property be assessed as a unit; Gulf's charter line property must necessarily be included in any such unit; there is no statutory authority for assessing the charter line separately; and, therefore, the Gulf property was fully assessed for the years in question (albeit, Gulf concedes, "perhaps erroneously"). As applied to the charter line property, historically treated as a separate tax entity, this argument clearly elevates form over substance. Sections 79 through 90 of the Revenue Act of 1939 (Ill. Rev. Stat. 1975, ch. 120, pars. 560-571)

provide ample direction, and section 220 (Ill. Rev. Stat. 1975, ch. 120, par. 701) provides the Department ample authority to assess the charter property for years past. We note, parenthetically, that defendant Kirk, who is charged with the duties of this assessment, does not deny the assessment can be carried out under his statutory authority, nor that such duty would be unduly burdensome.

The circuit court's judgment order provided that, effective August 10, 1972, "the Director of the Department of Local Government Affairs shall assess the Charter Property in the same manner as he assesses the property of other railroads in the State and he shall transmit the lists and information to the various proper taxing authorities of the Illinois counties *in which Charter Property is located.*" (Emphasis added.) Section 86 of the Revenue Act of 1939 (Ill. Rev. Stat. 1971, ch. 120, par. 567) contemplates (with minor variations) that the equalized assessed value of the railroad properties subject to assessment shall be listed and taxed in the several taxing districts in the proportion that the length of track within the taxing district bears to the total length of track owned or used in the State. Thus, the circuit court was in error in its concluding phrase, "in which Charter Property is located," for this phrase has the effect of directing the transmission of such assessment lists only to the taxing districts in which the charter line is located.

By the order of the circuit court, Gulf was responsible for property taxes as of August 10, 1972. One of the attorneys for the plaintiffs pointed out at oral argument that section 81 of the Revenue Act of 1939 (Ill. Rev. Stat. 1971, ch. 120, par. 562) requires new railroad companies to file their schedules "pertaining to real property in January, and pertaining to personal property on April 1 next after the location of their road." We interpret this to mean that filing was required by January and April 1973, respectively, and therefore conclude that the trial court erred in requiring Gulf, a new corporation, to be respon-

sible for the period from August 10, 1972, through December 31, 1972.

As stated above, there is adequate statutory authority to hold Gulf legally subject to retrospective taxation for the years 1973 to 1975. Separate considerations govern whether, for equitable reasons, Gulf should be required to make such payments in addition to the 7% gross receipt tax concededly paid for 1973, 1974 and 1975. Because there was no express charter authorization for the transfer of IC's charter tax status to Gulf, and because the law of the Charter Immunity Cases holds such attempted transfers invalid in the absence of express legislation, Snow argues that Gulf knew or should have known that such tax status could not be transferred to it by IC. He further urges that the judgment makes no change in existing law, unlike cases where this court has provided only prospective application. Gulf, to the contrary, asks not to be subjected to "double taxation" by the retrospective application of this judgment. We believe the circumstances of this case require us to fashion a judgment which does not impose an inequitable tax burden upon Gulf. The limited effect of the Commission's approval upon IC's charter tax status was not clearly foreshadowed in view of the constitutional powers of Congress to regulate commerce between the States and the powers to suspend State law bestowed upon the Commission in section 5(11). Moreover, Gulf could reasonably have taken various acts of the State legislature, subsequent to the charter, to indicate that the State would attempt to hold Gulf responsible for the payment of the charter tax. Gulf could likewise reasonably have expected the State to view the charter tax as the fair equivalent of other taxes, and could reasonably have expected the State to take the posture that the State did ultimately take—to accept the charter taxes in lieu of all other taxes. Based on the foregoing, we determine that partial retrospective application is appropriate. The trial court's judgment order is modified to provide that if any additional tax is found

to be due and owing from Gulf for any one of the years 1973, 1974, and 1975, such tax shall be limited to an amount that exceeds the charter tax already paid to the State for that year.

The judgment of the circuit court is hereby affirmed as modified, and the cause is remanded for further proceedings consistent with the views expressed herein.

*Affirmed as modified;*
*cause remanded.*

CLARK and DOOLEY, JJ., took no part in the consideration or decision of this case.